(C. D. 899)

SAMUEL DUNKEL & CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

·(Decided December 6, 1944)

*Brooks & Brooks* (*Frederick W. Brooks* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Robert C. O'Grady* and *Harold L. Grossman*, special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

WALKER, Judge: This protest is directed against the refusal of the collector of customs at the port of New York to allow drawback on certain tinned butter claimed to have been manufactured or produced in the United States with the use of imported merchandise, to wit, bulk butter from the Argentine. Section 313 (a) of the Tariff Act of 1930, under which the claim is made, reads in part as follows:

SEC. 313. DRAWBACK AND REFUNDS.

(a) ARTICLES MADE FROM IMPORTED MERCHANDISE.—Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used. shall be refunded as drawback, less 1 per centum of such duties * * *.

At the trial of the case the issues raised by the protest were limited by stipulation of counsel to the single question of whether the processing to which the imported bulk butter was subjected in order to produce the exported print butter constituted a manufacture or production within the purview of section 313, *supra*.

There is no dispute about the facts. The butter in question was imported from Argentina in 56-pound boxes. It was put into a machine from which it was pressed out through a die in rolls weighing 4 pounds each. These were cut off into 1-pound sections, parchment paper placed on top and bottom of the sections, and the sections set into tins. Because the die in the machine was not exactly the same shape and size as the tin, although approximately so, the butter had to be pressed down into the tin by hand to the level of the top of the tin, which was then sealed. There was evidence showing that a substantial price differential existed between bulk butter and butter in tins.

Evidence was also offered to show that · because of the terrific pressure used in forcing the butter through the die some of the constituents and the specific gravity were changed and some moisture was lost. We are satisfied, however, from the record that such change or loss as might occur during the processing was inconsequential, and that essentially the same butter was put into the tins as was contained in the imported boxes.

As outlined in the brief filed on behalf of the plaintiff, the latter rested his case chiefly upon the doctrine of long-continued practice,

citing particularly the case of *Joshua Hoyle & Sons, Ltd., Inc.* v. *United States*, 25 C. C. P. A. 128, T. D. 49244. In that case the court held, with reference to the question of whether bleaching and mercerizing of cotton cloth constituted such "manufacture" or "production" as would come within the provisions of section 313 (a), *supra*, that in view of the fact that it had been "the long-continued administrative practice to allow a refund of duties, as drawback, on cotton cloth imported in the 'gray' state and subseqently bleached and mercerized, and, as so processed, exported to a foreign country," and that such practice had continued under successive reenactments, without material change, of the drawback statute, the doctrine of legislative approval of long-continued administrative practice was determinative of the issues presented, and, of course, did not directly pass on the question of whether such bleaching and mercerizing actually constituted a "manufacture" or "production" within the meaning of those terms as used in the drawback statute.

It appears that at least from March 30, 1933, it has been the practice of the Treasury Department to allow drawback on the exportation of print butter produced with the use of imported bulk butter. See T. D. 46571 (a), 64 Treas. Dec. 149. The instant butter was manufactured under a so-called drawback "rate" relating to print butter issued to the plaintiff effective August 12, 1941.

Effective May 5, 1943, and without specifying the particular regulations or authorizations, the Commissioner of Customs revoked all regulations or authorizations under which drawback had been allowed on imported bulk butter which, subsequent to importation, had been cut to specific size and packed *in tins*, and exported. T. D. 50852, 78 Treas. Dec. 259.

In the brief filed on behalf of the Government it is said that

—the denial of drawback in the instant case amounts to a determination that the involved merchandise is not print butter—

and although two witnesses experienced in the trade stated that the involved tinned butter was so known in the trade, it would appear from the definition of the term "print butter" found in Funk & Wagnalls New Standard Dictionary (1941) that as commonly used it refers to a small portion of butter as used on the table which has been stamped with a print bearing a design. However, it would appear also that at the time of the issuance of the said drawback rate in the instant case the Treasury Department understood that the butter to be processed thereunder would be placed in tins, and it nevertheless characterized this product as "print butter."

So far as research has uncovered, there has been no case before the customs tribunals involving the drawback status of print butter

or of any commodity imported in bulk and processed into individual pieces or packed in consumer packages before exportation. Plaintiff has cited T. D. 46571 (a), *supra*, and T. D. 47069 (c), T. D. 47175 (b), (c), and T. D. 47446 (a) and (b), as published decisions of the Treasury Department announcing the establishment of drawback rates on print butter, and T. D. 40773 (b), T. D. 41842 (i), T. D. 43924 (g), T. D. 43943 (d) and (e), T. D. 44631 (j), T. D. 45067 (v), T. D. 45152 (h), and T. D. 47164 (f) relating to other products such as Roquefort cheese imported in bulk and cut into individual portions, soap imported in bars and exported in cakes or granulated or powdered form, etc., as establishing a long-continued administrative practice to regard such transformation as took place in the case of the butter at bar to come within the purview of the drawback statute requirements, and we may add that we have been unable to find any revocation of the same save the one cited in T. D. 50852, which evidently gave rise to the instant case.

It is true that with respect to print butter the published announcements do not appear to antedate 1933. However, the similarity in principle between the processes applied to print butter, the tinned butter at bar, and the cheese and soap and other products covered by the cited decisions, some of which go back to 1924, is so clear that it must be taken to have been the settled practice of the Treasury Department to consider processing of imported bulk products into individual pieces or into consumer packages to be such manufacture or production of articles as would entitle the exported product to drawback, and since the drawback statute was reenacted without material change, so far as the requirement of "manufacture" or "production" is concerned, in the tariff revision of 1930, we think the doctrine of legislative approval of long-continued administrative practice is as applicable here as it was in the case of *Joshua Hoyle & Sons, Ltd., supra.*

We can see no merit in the contention that a departmental practice to regard as a manufacture or production a process in all material respects similar to that here employed should not be held to be determinative of the issues herein merely because the cited practice related to a different type of package or to a different commodity than butter. So to hold would be to interpret the law for one man differently than for another, for if the repacking of Roquefort cheese imported in bulk into consumer packages is a manufacture or production, so is the repacking of bulk butter into consumer package tins. There is no material difference between the two in principle and the law must be interpreted the same for cheese packers as for butter packers.

We may say, also, that we consider such practice to have been fully warranted by the language of the drawback statute. In establishing the conditions on which the privilege of securing drawback would be

extended in section 313 (a), *supra*, Congress provided that the exported merchandise must be "manufactured or produced" in the United States with the use of imported merchandise. It is manifest from an examination of defendant's brief that its position was based upon the theory that the two words "manufactured" and "produced" were synonymous, and reliance is evidently placed in those decisions which have laid down the rules for determining when an article has become a manufacture of a material.

One of the most frequently quoted authorities on the subject of what constitutes a manufacture is *Anheuser-Busch Brewing Association* v. *United States*, 207 U. S. 556, 52 L. Ed. 336. There the court in passing on the drawback provisions of section 25 of the Tariff Act of 1890, among other things, said:

* * *. The words of the statute are indeed so familiar in use and of meaning that they are confused by attempts at definition. Their first sense as used is fabrication or composition—a new article is produced of which the imported material constitutes an ingredient or part. When we go further than this in explanation we are involved in refinements and in impracticable niceties. Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft* v. *Wiegmann*, 121 U. S. 609. * * * There must be transformation; a new and different article must emerge, "having a distinctive name, character, or use." * * *.

The foregoing has been relied upon many, many times since, both by this court and our appellate court, as expressing the law in cases *where articles are manufactured out of materials*, i. e., are "manufactures of" materials.

Assuming that the foregoing represents the state of the law with respect to the interpretation of the term "manufactured," we are still confronted with the word "produced." An excellently written, and, we think, well-reasoned opinion of Attorney General Bonaparte under date of September 19, 1908 (27 Op. Attys. Gen. 68), in response to a request of the Secretary of the Treasury, discusses this matter as follows:

It is also worthy of consideration that in every instance but one in this entire section the words "produced," "production," and "producer" are used in connection with the words "manufactured," "manufacture," and "manufacturer." The section thus begins: "Where imported materials on which duties have been paid, are used in the manufacture of articles manufactured or *produced*," etc.: and the second proviso reads: "That the imported materials used in the manufacture or *production* of articles entitled to drawback * * * when exported shall * * * be identified * * * the facts of the manufacture or *production* * * * shall be determined and the drawback due thereon shall be paid to the manufacturer, *producer*, or exporter, to the agent of either, or to the person to whom such manufacturer, *producer*, exporter, or agent shall, in writing, order such drawback paid."

Why this careful and repeated use of the idea of production in connection with that of manufacture? Was it intended as mere surplussage and to add nothing

whatever to the meaning of the act? It can hardly be thought that such was the purpose of Congress. But if it means anything at all, it must broaden the provisions of the act and make it include cases which would not be embraced in the word "manufacture." The fourth definition of the word "produce," as given by Webster, and the only one that can be here applicable, is, "To give being and form to; to manufacture; to make." There can, therefore, be but little difference between the two words "produce" and "manufacture," as used in this provision, but under this definition the word "make" can very properly be substituted for the word "produce;" and, since the technical meaning of the first part of the word "manufacture" has long since disappeared, the word "make" has substantially the same meaning as the word "manufacture," *stripped of its strict legal interpretation;* and it is but reasonable to suppose that Congress intended that this drawback provision should apply to cases which might not fall within the strict and limited construction given to the word "manufacture" by the courts, and for this reason added the word "produce" or its proper derivative. [Italics not added.]

The statute referred to in the foregoing was section 30 of the Tariff Act of 1897, which was unchanged in the act of 1909 (sec. 25), and although in the tariff revision of 1913 the language was changed somewhat, we think that such changes as were made were in harmony with the foregoing. Thus, for example, the opening sentence was changed from—

That where imported materials on which duties have been paid are used in the manufacture of articles manufactured or produced in the United States * * *,

as found in section 30 of the act of 1897 and section 25 of the act of 1909, to—

That upon the exportation of articles manufactured or produced in the United States by the use of imported merchandise or materials upon which customs duties have been paid * * *,

as found in paragraph O of the act of 1913, and the foregoing is substantially the language found in the 1922 and existing acts.

Following the reasoning of the attorney general, we think that the instant case is one in which the interpretation of the term "produced," as given above, applies. Here a substantial manufacturing effort was employed, resulting in a change in the form of the imported butter, which made it suitable for use in a particular manner, and which materially increased its value.

As we have said before, we have been able to discover no case which arose on the question of whether the repacking into consumer packages of imported merchandise constituted manufacture or production within the meaning of the drawback statutes. Our appellate court, however, in its opinion in the case of *Rolland Freres, Inc.* v. *United States*, 23 C. C. P. A. 81, T. D. 47763, touched upon the question of whether the term "produced" as used in the drawback statutes was intended to broaden the scope of the provision to include articles not "manufactured" within the technical, legal definition of that term, and although it found that the particular subject matter of that case,

embroidered dresses, could in no event come within the language of the statute, it did indicate its inclination to agree with such interpretation of the term. It was there said:

* * *. While we are inclined to agree with the contentions of the appellant herein that Congress, by the use of the new language in connection with the word "produced," intended to authorize drawback on certain articles which had not been "manufactured" as that term was sometimes technically defined, we are not disposed to give the provision such a construction as would warrant the allowance of drawback upon every article which had been brought into this country and subsequently exported, merely because some manufacturing effort had been expended thereon.

\*       \*       \*       \*       \*       \*       \*

It is not difficult to impute a meaning to the word "produced" which when referring to certain exported articles would permit drawback under the section in controversy when the term "manufactured" would not do so * * *.

For the reasons given, the protest claim is sustained, and judgment will issue accordingly.