CHRISTENSEN DIAMOND PRODUCTS CO.

v.

UNITED STATES.

C.D. 2537; Protest No. 63/8525.

United States Customs Court, Third Division.

June 3, 1965.

Donald Hiss, Washington, D. C., D. Ray Owen and David S. Geldzahler, New York City (James V. Siena and Edward I. Selig, Washington, D. C., of counsel), for plaintiff.

Andrew P. Vance, Chief, Customs Sec., Civil Div. (Glenn E. Harris and Charles P. Deem, Washington, D. C., Trial Attys.), for defendant.

Before DONLON, RICHARDSON and FORD, Judges.

RICHARDSON, Judge:

The merchandise of this protest is described on the invoice as "100 carats diamond dust." It consists of synthetically produced diamond particles in the size range 80/100 mesh, which were exported from Ireland and entered for consumption at Denver, Colo. The merchandise was classified by the collector under 19 U.S.C.A. § 1001, paragraph 214 (paragraph 214, Tariff Act of 1930, as modified), as an "earthy or mineral substance wholly or partly manufactured * * *" and assessed with duty at the rate of 15 per centum ad valorem. It is claimed by the plaintiff that the merchandise should be classified under the *eo nomine* provision for diamond dust in paragraph 1668, or, in the alternative, under either the provision for crude artificial abrasives in paragraph 1672, or the provision for artificial abrasives in paragraph 1514. The defendant contends that the merchandise is not classifiable as claimed and that it is properly classifiable under paragraph 214.

The competing tariff provisions applicable herein read as follows:

Paragraph 214, as modified by the General Agreement on Tariffs and Trade, T.D. 51802:

Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials * * * composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not * * *:

If not decorated in any manner:

\*    \*    \*    \*    \*    \*

Other ............15% ad val.

Paragraph 1668:

Diamonds and other precious stones, rough or uncut, and not advanced in condition or value from their natural state by cleaving, splitting, cutting, or other process, whether in their natural form or broken, glaziers' and engravers' diamonds, any of the foregoing not set, miners' diamonds, and diamond dust. [Free.]

Paragraph 1672, as amended August 28, 1954:

Emery ore and corundum ore, crude silicon carbide, and crude artificial abrasives, not specially provided for. [Free.]

Paragraph 1514, as modified by the Torquay Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52739:

All the following, if not containing over 0.1% of vanadium, or over 0.2% of tungsten, molybdenum, boron, tantalum, columbium or niobium, or uranium, or over 0.3% of chromium:

Artificial abrasives, in grains, or ground, pulverized, refined, or manufactured ..... ½¢ per lb. .

The instant protest was submitted to the court after trial, upon a record which consists of a stipulation of facts pertaining to synthetic and natural diamonds generally, extensive testimonial evidence from representatives of various fields in the industrial diamond industry, diamond experts and scientists, and customs personnel, relating to additional evidence not stipulated to by the parties, voluminous documentary evidence, and physical evidence in the form of specimens of both natural and synthetic diamond particles in various size ranges.

First, we must dispose of a question of evidence which was raised during the trial, and concerning which, decision was reserved for disposition with the main decision in the case. This question has to do with the admissibility in evidence of the testimony of two employees of the customs service which was proffered by the plaintiff as rebuttal testimony. The customs employees whose testimony is challenged by the defendant are Leroy Pipino (R. 576–591), a line examiner in the United States Appraiser's office in New York City, and Sidney Krakower (R. 594–597), supervisory liquidator in charge of the Administrative Section, Liquidating Division, in the office of the Collector of Customs, New York City.

By a ruling of the court, rebuttal evidence was limited to evidence of the meaning of the term "diamond dust" in and prior to 1930. At the conclusion of the testimony given by each of the aforesaid witnesses, defendant's counsel moved to have the testimony stricken from the record on the ground that the testimony was beyond the permissible scope of rebuttal evidence. We have carefully reviewed the testimony elicited from each of said witnesses and find nothing contained therein which has any bearing on the meaning accorded to the term "diamond dust" in and prior to 1930. All of the testimony of these witnesses as to classification and decisions relating to classification of diamond dust have to do with a period of time commencing well after 1930. As such, this testimony is not within the scope of rebuttal evidence, and must, therefore, be stricken from the record. Accordingly, the defendant's motions to strike such testimony are granted.

Much of the mass of evidence before us is of a technical and scientific nature. And the issue to be resolved by the evidence, as we see it, is whether the subject merchandise is diamond dust, or whether it is something else. It is clearly established in the record that synthetic diamond particles such as those imported herein are composed of diamond mineral, that these synthetic particles possess many chemical, mineralogical, and physical properties identical to those of natural diamond, are considered by scientists and the industrial diamond trade to be diamond, and in general the end uses of the synthetic

particles are the same as those to which natural diamond particles are put, namely, they are used as abrasives in wheels, saws, and other tools for the grinding, abrading, cutting, and polishing of numerous hard materials. Variations do exist between natural and synthetic diamonds, as the record discloses. Thus, it is found that natural diamonds have a color range from gray-black to gray to colorless, while synthetic diamonds range in color from green to gray to yellow to colorless. Few natural diamonds are found to be magnetic; but synthetic diamonds are usually found to be slightly ferromagnetic. The impurity levels, which are said to affect the variations of color and magnetism, differ with the origin of the diamond. In the case of natural diamonds, the impurity level ranges upwards from 0.01 percent, while the impurity level in synthetic diamonds ranges upwards from 0.1 percent. None of these variations appears to have any commercial significance, however, in the industrial use of diamond as abrasive material.

However, both natural and synthetic diamonds possess variations in crystal strength and structure which are of commercial significance. The degree of crystal strength and type of structure usually determine the use application of the particle as an industrial abrasive. Weaker diamond particles are used in resin-bonded applications, while the stronger particles are used in metal-bonded applications. In the case of natural diamonds, particles of the size ranges with which we are here concerned do not occur in nature in such form. They are derived mainly from the deliberate crushing or pulverization of larger diamond material known as bort or fragmented bort. However, after synthetic diamonds became available in this country in commercial quantities in 1957, and still later in a number of other countries, this process of crushing or pulverizing large particles into small ones was duplicated for the synthetic diamond as well.

In the light of these general observations, we turn next to a consideration of the first claim made by the plaintiff, namely, that the subject merchandise is embraced within the *eo nomine* provision for "diamond dust" in paragraph 1668. In this connection, the first question to be considered is whether the term "diamond dust," as used in paragraph 1668, is limited to natural diamond dust, that is, diamond dust obtained from natural diamonds.

The Bureau of Customs found that the paragraph did not include synthetic diamond dust, stating:

The wording of paragraph 1668 is strongly persuasive that the paragraph is limited to diamonds in the forms there provided for in their natural state only. This would preclude the direct classification of synthetic diamond dust under that free provision.

\* \* \* \* \* \*

There is too much uncertainty on both the facts and the law to warrant the classification of synthetic diamond dust as diamond dust under paragraph 1668 on the principle of such decisions as the camphor case (T.D. 29077).

Plaintiff claims, however, that paragraph 1668 covers at least four distinct categories of merchandise and that the reference to natural state and form appear only in the first. It breaks the paragraph down as follows:

(1) Diamonds and other precious stones, rough or uncut, and not advanced in condition or value from their natural state by cleaving, splitting, cutting, or other process, whether in their natural form or broken,

(2) glaziers' and engravers' diamonds, any of the foregoing not set,

(3) miners' diamonds, and

(4) diamond dust.

Defendant argues that the intent in separately designating diamond dust,

miners' diamonds, etc., was to permit free entry for such items, notwithstanding that they may have resulted from articles previously named having been advanced in condition or value; that Congress referred only to such materials as could be advanced in value or condition from their natural state, and intended paragraph 1668 to encompass materials or articles solely of natural origin.

In order to determine the intent of Congress, it is pertinent to examine the legislative history of the provision at issue.

Diamonds have been included in various tariff acts for over a hundred years, but the term "diamond dust" first appeared in the Tariff Act of 1883, 22 Stat. 518. The free list there included the following two items:

> Diamonds, rough or uncut, including glaziers' diamonds. Diamond dust or bort.

Diamond dust continued on the free list in the acts of 1890, 1894, 1897, and 1909, under provisions with varying language:

Tariff Act of 1890:

> Par. 557. Diamonds and other precious stones, rough or uncut, including glaziers' and engravers' diamonds not set, and diamond dust or bort, and jewels to be used in the manufacture of watches. 26 Stat. 605.

Tariff Act of 1894:

> Par. 467. Diamonds; miners', glaziers', and engravers' diamonds not set, and diamond dust or bort, and jewels to be used in the manufacture of watches or clocks. 28 Stat. 539.

Tariff Act of 1897:

> Par. 545. Diamonds and other precious stones, rough or uncut, and not advanced in condition or value from their natural state by cleaving, splitting, cutting, or other process, including miners', glaziers' and engravers' diamonds not set, and diamond dust or bort. 30 Stat. 197.

Tariff Act of 1909:

> Par. 555. Diamonds and other precious stones, rough or uncut, and not advanced in condition or value from their natural state by cleaving, splitting, cutting, or other process, including glaziers' and engravers' diamonds not set.

> Par. 556. Miners' diamonds, whether in their natural form or broken, and bort; any of the foregoing not set, and diamond dust. 36 Stat. 75.

Diamond dust was made dutiable in the Tariff Act of 1913 and the Tariff Act of 1922 at the rate of 10 per centum ad valorem. Glaziers' and engravers' diamonds, unset, and miners' diamonds continued free. Paragraph 357 of the Tariff Act of 1913 reads as follows:

> Diamonds and other precious stones, rough or uncut, and not advanced in condition or value from their natural state by cleaving, splitting, cutting, or other process, whether in their natural form or broken, and bort; any of the foregoing not set, and diamond dust, 10 per centum ad valorem; * * *. 38 Stat. 149.

The provision in the Tariff Act of 1922 is the same except for the omission of bort. The Tariff Act of 1930 placed the rough and uncut diamonds and diamond dust which had been dutiable under the act of 1922 on the free list, combining the provision with the one covering glaziers', engravers', and miners' diamonds.

The provision in the Tariff Act of 1897 has been before the court on several occasions. United States v. Fifteen Drilled Diamonds, D.C., 127 F. 753, 7 Treas.Dec. 295, T.D. 25046; Sullivan Machinery Company v. United States, C.C., 168 F. 561, 17 Treas.Dec. 267, T.D. 29649; American Express Company v. United States, 8 Treas.Dec. 275, T.D. 25565, affirmed United States v. American Express Company, C.C., 140 F. 967, 9 Treas.Dec. 1074, T.D. 26490.

In the case first cited, the merchandise consisted of drilled diamonds of an inferior quality called bort, to be used in the construction of dies for reducing and regulating the size of wire to be drawn. The plaintiff claimed that it was entitled to free entry under paragraph 545, supra, but the Government contended that it was dutiable as diamonds, advanced, under paragraph 435 of the Tariff Act of 1897, 30 Stat. 192. The court rejected the Government's argument that the distinction in the paragraphs was between diamonds that had been advanced by some process and diamonds, rough and uncut, and not advanced by any process. The court pointed out that, if the merchandise had been diamond dust, the demand for duty could have been made with equal emphasis. The court held the merchandise was not dutiable, stating:

> * * * It would seem that in paragraph 545 diamonds, under certain conditions, are placed upon the free list, and then, fearful lest certain articles which it intended to exempt from duty might by construction be held not to have fallen within the prescribed conditions, the Congress added the words from "process" to the end of the paragraph.

In Sullivan Machinery Company v. United States, supra, it was held that the qualifying words following "other precious stones," to and including "other process," refer only to the preceding phrase "diamonds and other precious stones," and that miners', glaziers', and engravers' diamonds, whether whole or split, are free of duty if they are not set. It is noted that the words "and diamond dust or bort" follow the words "miners', glaziers' and engravers' diamonds not set," in the statute of 1897.

The merchandise in American Express Company v. United States, supra, consisted of bort pierced by a process of drilling. It was held entitled to free entry under paragraph 545, Tariff Act of 1897, the court stating:

> * * * Miners', glaziers', and engravers' diamonds, although cut

to some extent for the purpose of giving a superior cutting surface to the stones, are nevertheless free under paragraph 545, if not set, and, finally diamond dust is neither capable of being cut nor set; hence it would seem that the limitations applying to diamonds of the first kind are not alike applicable to those of the second description. Certainly they do not apply to diamond dust or bort. It is obvious that Congress intended that a class of merchandise not produced in this country and which is used exclusively for industrial purposes, should be exempt from duty, and we can not suppose that miners, engravers, and glaziers are to be the sole beneficiaries of the tariff act.

The bort in question was designed for use of wire makers—a very important industry in this country—and, as shown by the testimony, is in the crudest form in which bort can be imported for that purpose. * * *

The evidence further shows that the diamonds in dispute are commercially known as drilled bort, and inasmuch as this substance is provided for in paragraph 545 without qualifying words, it follows that a prefix added to the word "bort" does not exclude it from entry under this paragraph. * * *

In the succeeding tariff act (1909), diamond dust was included in a separate paragraph from that covering rough or uncut diamonds, not advanced from their natural state. In the acts of 1913, 1922, and 1930, it was included in the paragraphs covering such diamonds, but always at the end of the paragraph, so that the clause limiting diamonds and other precious stones to those not advanced from their natural state did not apply. Hensel v. United States, 3 Ct. Cust.App. 117, 118, T.D. 32366; Borgfeldt v. Erhardt, C.C., 41 F. 102.

Both grammatically and by judicial construction, the words in paragraph 1668, "not advanced in condition

or value from their natural state by cleaving, splitting, cutting, or other process, whether in their natural form or broken," do not apply to "diamond dust." The legislative history also indicated that "diamond dust" was considered by Congress as a separate commodity, since it was sometimes provided for in a paragraph entirely separate from the one covering rough and uncut diamonds, not advanced in value or condition.

The words "natural state" and "natural form" are not appropriate to the commodity known as "diamond dust," since diamond particles of the size ranges of that commodity are not found in nature but are the result of the cutting or faceting of larger diamonds or the crushing of bort. (Stipulation, paragraph 6.)

Although Congress was aware, prior to 1930, that real diamonds had been made artificially, it did not confine the provision for diamond dust to such as was produced from natural diamonds.

▆ The provision for diamond dust in paragraph 1668 is an *eo nomine* one. As was stated in A. N. Deringer, Inc. v. United States, 38 Cust.Ct. 327, 330–331, C.D. 1882, "Generally, an unqualified provision for a given article includes such named article made by artificial means, unless there is a manifested contrary legislative intention, commercial designation, long-continued administrative practice, or legislative approval of judicial construction. Joseph Weiss Co., Inc. v. United States, 31 Cust.Ct. 17, C.D. 1539 (artificial corundum); Larzelere & Co. v. United States, 8 Ct.Cust. App. 64, T.D. 37198 (artificial corundum); Jacob J. Vollrath Manufacturing Company v. United States, 7 Treas.Dec. 190, T.D. 24990 (artificial cryolite); Roessler & Hasslacher Chemical Co. v. United States, 30 Treas.Dec. 61, T.D. 36077 (synthetic cryolite); Wm. Pickhardt & Kuttroff v. United States, 1 Treas.Dec. 641, T.D. 20925 (synthetic indigo); Klipstein & Co. v. United States, 4 Ct.Cust.App. 510, T.D. 33936 (indigo paste, produced from synthetic indigo); Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 4 S.Ct. 455, 28 L.Ed. 433 (artificial alizarine)."

In the Deringer case, it was held that the terms "india rubber," "hard rubber," and "synthetic rubber," as used in the tariff act were distinguishable and had narrower meanings than the word "rubber," used without qualification. The latter term was held to include rubber produced by artificial means, provided it was the same substance or had the essential characteristics and qualities of the material known as rubber, or was known in the trade as rubber. The record established that tires in part of synthetic rubber were considered to be rubber tires by those engaged in buying and selling them and that there was no difference between tires in chief value of natural rubber and those in chief value of natural and synthetic rubber combined. It was, therefore, held that the latter were classifiable as in chief value of rubber.

There are two cases in which synthetic rubies were held not to be classifiable as natural rubies would have been. S. Nathan & Co., Inc. v. United States, 37 CCPA 99, C.A.D. 426, and Harry W. Friedland v. United States, 33 Cust.Ct. 6, C.D. 1626. In the Nathan case, it was held that synthetic rubies and synthetic sapphires were not classifiable directly under the *eo nomine* provision in paragraph 1528 of the Tariff Act of 1930 for "diamonds, coral, rubies, cameos, and other precious stones." The court pointed out that the record fell short of proving that they should be so classified since the witness stated that synthetic stones were sold as such and not as genuine or natural stones and that the term precious stones applied solely to genuine or natural stones. It was held that the imported articles were not enumerated in the tariff act but, since they most resembled rubies and other precious stones enumerated in paragraph 1528, they were classifiable under that paragraph by similitude.

In the Friedland case, it was held that synthetic rubies were classifiable under

paragraph 214, Tariff Act of 1930, as articles composed of mineral substances rather than free of duty as precious stones, rough or uncut, and not advanced in condition or value from their natural state under paragraph 1668. The court stated (pp. 10–11):

> The trouble with the contention of counsel for the plaintiff is that the term "rubies" is not mentioned in paragraph 1668. In every one of the cases cited above, the synthetic article was held dutiable under the *eo nomine* provision for the natural article. Unfortunately for plaintiff's position here, we do not have that state of facts.

> Counsel for the Government contends that paragraph 1668 provides for precious stones in a rough or uncut condition, not advanced in value from their natural state, and, therefore, contemplates only the natural precious stones and not synthetic precious stones. It is argued that a precious stone cannot be both synthetic and natural and, since the similitude clause has no application, inasmuch as the merchandise is a mineral substance and so provided for under paragraph 214, cases involving *eo nomine* designations, cited by the plaintiff, are inapplicable.

> We are of the opinion that inasmuch as paragraph 1668 fails to provide *eo nomine* for rubies, without regard to their condition, but rather provides for precious stones in a natural state, the synthetic rubies in question are more specifically provided for as articles, wares, and materials, composed wholly or in chief value of mineral substances, under paragraph 214, as assessed by the collector.

■ Diamond dust is not a stone, precious or otherwise. Therefore, the decision in the Nathan case which was based on the fact that synthetic stones were not regarded as precious stones is not controlling. Neither is the Friedland case, since there is an *eo nomine* provision in paragraph 1668 for diamond dust, without regard to its condition. Thus, it is appropriate to apply the general rule, namely, that synthetic diamond dust is properly classifiable as diamond dust provided it has the essential characteristics and qualities of natural diamond dust.

The term "diamond dust" is defined in the 1930 edition of Funk & Wagnalls New Standard Dictionary as:

> The fine powder resulting from the friction of two diamonds in cutting: used in polishing gems, etc.; * * *.

An earlier definition of "diamond dust" is contained in the 1902 edition of The Century Dictionary as:

> A fine dust produced in diamond-cutting by the abrasion of two stones against each other. It is used in cutting and polishing diamonds, rubies, sapphires, and topazes, and in making cameos, intaglios, etc. * *

Another pre-1930 definition of "diamond dust" is contained in an encyclopedia, entitled Materials Handbook, and published by McGraw-Hill Book Company, Inc., in 1929 (plaintiff's brief, appendix B, viii) defining "diamond dust" as:

> A powder obtained by crushing bort, or from the refuse obtained from the cutting and faceting of gem diamonds. It is used for grinding and polishing hard steels, and for cutting other stones. It is imported largely from France and England.

And the 1929 Summary of Tariff Information (p. 2018) defines "diamond dust" as:

> * * * Diamond dust is a powder used as an abrasive material and is obtained by crushing bort, or by rubbing together diamonds in the process of faceting. It is used for cutting and polishing diamonds and other precious stones.

None of the above definitions of the term "diamond dust" or any others which we have been able to find give any indication of the size ranges of the particles covered by that term. And nothing in the legislative history of the tariff provision for diamond dust reveals any congres-

sional intent with respect to size range of particles included in the term "diamond dust." Particle size is a crucial issue between the parties herein. It is contended by the defendant that only the micron sizes of diamond particles were intended by Congress to be included within the term "diamond dust." On the other hand, plaintiff argues that the term includes both mesh and micron sizes of diamond particles.

The evidence is by no means uniform. Some of the witnesses in the industry testified that the term "diamond dust" was used in and prior to 1930 to embrace only those diamond particles in the micron-size ranges. Still other witnesses in and conversant with the language of the industry in the pre-1930 era testified that the term "diamond dust" embraced the full range of mesh and micron sizes of diamond particles. Such words as "powder" and "fines" were used in the industry as synonyms for the word "dust" and sometimes for the word "micron." Other synonyms employed in the industry for the word "mesh" include the words "grit" and "grains." None of these synonyms, however, are indicative of particle size.

Apparently, those witnesses who claim that diamond dust referred only to the micron-size particles have taken the view that the industrial uses of diamond dust in and prior to 1930 were confined to polishing applications, and that the larger mesh-size diamond particles possessed no utilitarian value for such applications. However, we find this view difficult to believe, in view of documentary references in the record to abrasive use of diamond dust in the pre-1930 era. In the 1930 edition of Funk & Wagnalls New Standard Dictionary (plaintiff's brief, appendix B, xiii), the word "diamond-wheel" is defined as:

A metal wheel whose edge is filled with diamond-dust and oil in grinding and polishing diamonds and other gems.

Also, the word "diamond-cutting" is there defined as:

The art, process, or business of cutting and polishing diamonds. Diamonds are cut by rubbing two of them together, or by means of a wheel, disk, wire, or the like, covered with diamond-dust.

In the 1902 edition of The Century Dictionary (plaintiff's brief, appendix B, xv), the word "diamond-wheel" is defined as:

In *gem-cutting*: (*a*) A wheel made of copper and charged with diamond-powder and oil, used in grinding any gem. (*b*) A similar wheel made of iron, used with diamond-powder and oil in grinding diamonds. It makes from 2,000 to 3,000 revolutions a minute. Also called *skive*.

And the word "diamond-mortar" is there defined as:

In *seal-engraving*, a hard steel mortar used to grind diamonds into a fine powder for use in engraving or cutting. * * *

In a publication of the United States Department of Commerce, Bureau of Mines, issued in 1928 and 1929, entitled "Mineral Resources of the United States" (plaintiff's brief, appendix B, i and iii), a reference to abrasive diamonds contains the following statement:

Fragments of bort are pulverized to form diamond dust which is used for cutting and polishing precious stones, as an abrasive in drilling diamonds to make diamond dies, and in sawing porcelain and similar hard materials.

And, in a publication, entitled Industrial Carbon by C. L. Mantell, Ph. D., published in 1928 by D. Van Nostrand Company, Inc. (plaintiff's brief, appendix B, v), a reference is made to diamond dust as an abrasive in the making of wire dies. The publication states:

Diamond dust is a superior abrasive due to the rapidity with which it does its work. * * *

\* \* \* \* \* \*

\* \* \* A hole, tapered at either end, is started in a thin fragment of diamond by a diamond point and finished by a steel drill fed with diamond dust.

To the extent then that the size of the diamond particle embraced within the term "diamond dust" is controlled by the pre-1930 uses of diamond dust, the diamond dust particle would appear to have been larger than that covered only by the micron-size ranges. As far as actual size ranges of diamond dust particles are concerned, additional documentary references in the record are particularly illuminating of the common usage of the term "diamond dust" in and prior to 1930. A publication put out in 1921 by the Ordnance Department, United States Army, entitled Manufacture of Optical Glass and of Optical Systems (plaintiff's brief, appendix B, ix), contains references to the grinding and cutting of glass. The publication states:

\* \* \* For coarse cutting, the tool is charged with diamond dust which passes through an 80-mesh but is retained on a 100-mesh sieve.

And, in another reference, the publication states:

In one type of diamond saw fine diamond dust (80 to 100 mesh) mixed with thick oil is introduced along the periphery of the saw by filling it into fine cross-cuts made with a sharp chisel edge and then closing the cuts by means of an accurately fitting hard-steel roller pressed against the edge of the slowly rotating disk.

It is to be remembered that the synthetic material of the instant importation is of the same size category, namely, 80/100 mesh. Moreover, plaintiff's exhibit 31 consists of a patent, issued by the United States Patent Office to the General Electric Co. in 1935 for an "Abrading Tool" based upon an application filed therefor in 1929, in which reference is made to the abrading portion of the involved tool consisting of "finely divided diamond dust or powder uniformly distributed through a sintered binder material." The application goes on to state:

Tools formed according to my process are not only suitable for drilling purposes but may be employed to smooth or face grinding wheels and the like. In the latter case it will be found desirable to employ a coarse diamond powder, for example a powder which will pass a 40 to 60 mesh, whereas for high speed drilling work, the diamond powder will have a fineness sufficient to pass a 100 mesh and for producing highly polished surfaces the diamond powder will be even finer.

Likewise, plaintiff's exhibit 32 consists of a patent, issued by the United States Patent Office to the General Electric Co. in 1933 for a "Diamond Charged Cutting Tool Bit," based upon an application made therefor in 1929 in which diamond particles are employed. With reference to size of particle, the application states:

The diamond particles may vary in size depending upon the work to be performed but should be as large or larger than the particles of the cemented tungsten carbide matrix in which they are embedded. It will be found that diamond dust or powder which will pass a 40 to 100 mesh will give satisfactory results.

Equally as persuasive of the belief that mesh-size diamond particles come within the designation "diamond dust" is the actual inspection of the mesh-size diamond particles themselves. Although we were not shown samples of the merchandise actually imported herein, we did examine closely all of the vials of diamond dust, both natural and synthetic, which were received in evidence. These specimens of diamond particles ranged in size from natural diamond stones and bort down to very fine micron-size powders. Only one vial appeared to contain specimens of an 80/100-mesh-size diamond particle, and this one was of the synthetic type, which was said to be of domestic origin, but a prototype of the subject merchandise. However, there were several vials of both natural and synthetic diamond particles

in the 60/80-mesh-size category, a larger size than that here involved. A careful examination of the contents of the vials containing these 60/80-mesh-size particles discloses that they are smaller than the grains of common table sugar. In fact, we are impelled to the conclusion that even these larger 60/80-mesh-size diamond particles identify well with the appellation "dust," for they fit comfortably within one's concept of what a dust, of any composition, would be expected to look like. Consequently, particle appearance alone is strongly suggestive that the word "dust," as used in the statute, has an ordinary and common meaning which embraces mesh-size diamond particles, and is not limited in its application to scientifically identifiable micron sizes.

Upon all of the evidence presented, we are of the opinion that mesh-size diamond particles are included within the tariff designation "diamond dust." Inasmuch as particle size appears to be the principal issue litigated between the parties, and the record clearly establishes that the imported merchandise is essentially similar to natural diamond dust in composition, function or use, and appearance, the subject merchandise is entitled to classification under the *eo nomine* provision for "diamond dust" in paragraph 1668 and we so hold. It, therefore, becomes unnecessary for us to consider the other claims advanced by the plaintiff for alternative classification of the merchandise. The protest claim to paragraph 1668 classification is sustained, and all other protest claims are dismissed.

Judgment will be entered accordingly.

DONLON, Judge (concurring):

This is one of several cases, all having to do with imported synthetic diamond dust, some of which (as this) are protests filed under section 514, and some are protests filed under section 516(b), as amended. The section 516(b) protest cases are not ready for entry of judgment.

There is a difference of opinion in the division as to procedure, both as to the priority mandate of section 2638 of the Judicial Code and as to the desirability of coordinating opinion language, in the related cases, to obviate confusion and minimize misunderstanding.

Believing, as I do, that prior obligation under the Judicial Code is to section 516(b) cases but recognizing, as I also do, that only our court of appeals can decide between conflicting views as to the interpretation of section 2638 I vote to concur herein with the reservation that if it should be deemed necessary or wise, when the related section 516(b) cases are decided, to modify language or explain arguments, *dicta* or nuances of expression herein which, in the light of the section 516(b) decisions, seem to call for elucidation, I shall do so.