(C.D. 2538)

ENGELHARD HANOVIA, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 3, 1965)

*Busby and Rivkin* (*Saul L. Sherman* and *David Busby* of counsel) for the plaintiff.
*Andrew P. Vance*, Chief, Customs Section, Civil Division (*Glenn E. Harris*, trial attorney), for the defendant.

Before Donlon, Richardson, and Ford, Judges; Donlon, J., concurring

Richardson, Judge: The merchandise involved in this case consists of diamond particles, synthetically produced, ranging in size from that known as 60 mesh to that known as 170 mesh, exported from South Africa and entered for consumption at Newark, N.J. It was described on the invoice as "Rough and Uncut Diamonds, Diamond Powder, Synthetic Grit, 15,000 carats." It was assessed with duty at 15 per centum ad valorem under 19 U.S.C.A., section 1001, paragraph 214 (paragraph 214, Tariff Act of 1930, as modified), as an earthy or mineral substance wholly or partly manufactured, not specially provided for. It is claimed to be entitled to free entry under paragraph 1668 of said tariff act as diamond dust. Alternate claims for classification under paragraphs 1672 and 1514 have been withdrawn for the purposes of this proceeding.

The pertinent provisions of the tariff act are as follows:

[Par. 214, as modified by the General Agreement on Tariffs and Trade, T.D. 51802] Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not * * * :

   If not decorated in any manner :

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

   Other _____ 15% ad val.

Par. 1668. Diamonds and other precious stones, rough or uncut, and not advanced in condition or value from their natural state by cleaving, splitting, cutting, or other process, whether in their natural form or broken, glaziers' and engravers' diamonds, any of the foregoing not set, miners' diamonds, and diamond dust. [Free.]

The issue in this case is whether the imported merchandise is classifiable under the provision for "diamond dust." Three questions are argued in the briefs: (1) Whether paragraph 1668 includes diamond dust which is not derived from natural diamond; (2) whether the term "diamond dust" includes diamond particles of the sizes involved herein; and (3) whether the imported synthetic diamond particles

sufficiently resemble natural diamond dust in its essential characteristics as to be classifiable as such.

The parties have stipulated some of the facts and have also introduced testimony and exhibits.

According to the stipulation, diamond particles of the size ranges known as diamond dust have not been found to occur in nature. They have resulted as a by-product of the cutting or faceting of larger diamonds of gem-stone quality, or, since World War I, from the crushing of diamonds of lower quality (or bort, an imperfectly formed diamond). Efforts have been made since 1880 to synthesize diamond, and, in 1957, synthetically produced diamond particles similar to those involved herein were made available commercially by the General Electric Co. Such particles are graded according to size and shape; they are produced in a predetermined relatively narrow size range; and approximately 5 percent are deliberately crushed to obtain smaller particles for commercial abrasive applications.

It appears from the testimony that diamond particles are measured in mesh and micron sizes. Generally speaking, the coarsest size is 16 to 20 mesh. Mesh or sieve sizes are determined as follows (R. 40–41):

* * * we stack sieves one on top of the other, each sieve being composed of square holes made of wires. And 16 mesh would be 16 holes to the inch, 16 in each direction, 16 square, in other words. 20 mesh would be 20 holes, and all the way down to 400 holes square. So that when we throw the diamond dust on the top screen and it falls through the various screens, they are sifted in a prescribed manner, we separate the screens and the material that stays on top of each screen is graded according to the screen it went through and the screen it stayed on top of. So that 16–20 mesh would be material that fell through the 16 screen, the one with the 16 holes per inch, and stayed upon the one with the 20 holes per inch.

Such sizes are referred to today as mesh sizes, grit sizes, diamond grit, and diamond mesh. The smallest commercial sized screen is either 325 or 400 mesh. 325/400 mesh is equivalent roughly to 35 to 85 microns, and from that point on grading is by micron, down to a theoretical zero.

Both natural diamond particles and synthetic diamond particles contain diamond mineral which is identical in atomic structure; both contain 99 percent pure diamond, plus impurities. The principal impurity in both is nitrogen. Other impurities vary. In natural diamond particles, the impurities are usually 0.01 percent by weight and rarely exceed 0.1 percent by weight. Synthetic diamond particles typically contain mineral substances, including iron, nickel, or cobalt, or a combination of these, which are rarely found in natural diamond particles. There are also color and ferromagnetic variations which are a means of distinguishing the particles according to origin, but they are not of commercial significance.

Natural diamond particles are usually smoother and more blocky in shape than synthetic diamond particles. In the larger sizes, natural diamond is usually monocrystalline, but is frequently polycrystalline. Synthetic diamond particles are usually manufactured to be polycrystalline. In the finer sizes, diamond particles are so small that all are monocrystalline, whether natural or synthetic.

Natural and synthetic diamond particles are identical as to hardness, heat characteristics, refractive index, entropy, dissociation energy, and susceptibility to pulverization in a steel mortar. Synthetic diamond particles can be made so that their resistance to breaking or crushing, as measured by friability and/or crystal strength, is approximately the same or measurably less than that of commercially available natural diamond particles.

Both synthetic and natural diamond particles can be characterized as being abrasives; both are used commercially as fixed abrasives in resin-bonded and metal-bonded grinding wheels. The precise commercial applications differ to some extent because of variations in crystal structure and strength. Subsequent to the development of synthetic particles, sellers of natural diamond particles began to select and classify for particular industrial abrasive uses natural particles having the performance characteristics of synthetic particles. Diamond particles are now commercially identified, ordered, and sold not only by size but by industrial abrading characteristics.

At the time of entry of the subject merchandise, an entry of diamond particles derived from natural diamond in the size range of 16/20 mesh or smaller would have been accorded free entry under the provision for diamond dust in paragraph 1668.

There is testimony in the record as to the meaning of the term "diamond dust" and the size range of the particles embraced within that term, among other things. Charles Baumgold, president of Diamond Tool Research Co., Inc., a firm dealing in industrial diamonds, testified on behalf of the plaintiff. Mr. Baumgold has been in the industrial diamond business since 1933. He testified that the term "diamond dust" means the conglomerate which results from the crushing of low value diamonds. In terms of particle size, the term includes anything from coarse grit down to extremely fine powder. According to Mr. Baumgold, synonyms often used in the industry in place of the term "diamond dust" are "powder" (used either loosely to cover the whole range, or, in a narrow sense to embrace only micron-size particles), "grit" to refer to particles down to 325/400-mesh size, and "micron powder" to refer to particles below 325/400-mesh size. Mr. Baumgold was of the opinion that a diamond particle designed for abrasive use is "diamond dust." He could think of no use for an 80-mesh size particle other than as an abrasive. He did state, however, that there

could be other uses for a particle in the 20-mesh size category. He pointed out that there are very small diamonds used in drilling which would not be called "diamond dust."

This latter view of the witness Baumgold regarding "small diamonds" was shared by the plaintiff's other witness, Leroy N. Pipino, an examiner of diamonds and diamond dust, who has been so employed in the Office of the Appraiser of Merchandise at the port of New York since 1947. He stated that the customs practice of classifying diamond dust (derived from natural diamonds) is based on the definition of diamond dust which is contained in the Summary of Tariff Information, wherein diamond dust is defined as "a powder used as an abrasive." The witness stated that there is no numerical test or measurement to determine the size of a diamond particle as a criterion for determining classification. Particle use is the customs basis for classifying the material. Thus, according to Mr. Pipino, finely pulverized diamond particles, usable as abrasives without further crushing, results in the classification of such particles as "diamond dust" under paragraph 1668. Mr. Pipino also testified that, about 8 years ago, the subject merchandise commenced coming in as sieved particles, and that, prior to that time, back to about 1942, the material came in as fragmented bort.

A different notion about "diamond dust" and the sizes of particles included in the term "diamond dust" is entertained by defendant's witnesses. One of the witnesses called by the defendant gave testimony concerning the meaning of "diamond dust" and the sizes of particles included in that term.

Frank Koebel, executive vice president of the Van Ittalie Corp., a firm dealing in diamonds, has been in the industrial diamond industry since 1914. He testified that, prior to 1932, the term "diamond dust" was used in the trade synonymously with the term "diamond powder" to denote only the finely graded diamond particles smaller in size than 325 mesh. These fine particles were used for polishing purposes. No term was ascribed to the coarser particles for which no use was then made. With the advent of the Norton grinding wheel in 1932, these coarser particles began their employment as abrasives in grinding wheels. But, according to Mr. Koebel, these coarser particles were not even then known as "diamond dust"—they were called "grit," "diamond grit," or "mesh size" particles. Mr. Koebel stated that subsequent developments in the trade expanded the term "diamond dust" to include the larger as well as the smaller sizes.

Mr. George Kaplan, a diamond cutter associated with the firm of Lazare, Kaplan & Sons, Inc., a firm engaged in the business of purchasing, cutting, and polishing gem diamonds, described a method of sawing diamonds (gem quality) with a saw impregnated with diamond

particles of the size range of 300 mesh or smaller. He testified that the gem trade referred to particles of that size as diamond powder or diamond dust. He did not, however, say anything about trade terminology for larger sized diamond particles.

There is also testimony in the record regarding the commercial significance of variations between synthetically produced diamond particles, and particles derived from diamond found in nature.

Mr. Baumgold testified that after General Electric brought out its synthetic diamond particles, it was found that they had certain features not found in natural diamonds, such as irregularity and ability to be held in a resinoid matrix. He said that natural diamond particles were then assorted so that they, too, had the same characteristics. Some were found to be better suited for being held by metallic bonds and some by resinoid bonds. Natural and synthetic particles were then graded according to use. The manufacturers of synthetic particles produced types and shapes that were suitable for certain uses and dealers in natural diamonds came up with natural particles that were suitable for such uses. Today, both natural and synthetic particles are used in trade and commerce in resin and metal bonded wheels.

According to Mr. Baumgold, the most important characteristics of diamond particles in terms of their industrial application as abrasives are hardness, ability to resist abrasion, and shape. The type of particles to be used and whether natural or synthetic, depends upon the needs of the customer. The only way to determine with certainty which is most suitable is through an actual test in the plant, but this is not economically feasible. Mr. Baumgold stated that, broadly speaking, all industrial grinding wheel manufacturers in this country today use and stock both natural and synthetic diamond dust for use in their wheels. He did not know of any industrial abrasive use for which synthetic diamond dust is invariably used. In general, synthetic and natural particles can be applied to the same uses. Mr. Baumgold stated that there is no use that synthetic can be applied to that natural diamond cannot be applied to, but that there are some uses for which synthetic diamond is not strong enough.

Oswald E. Olivieri, plant manager and chief engineer of J. K. Smit & Sons, Inc., manufacturer of industrial diamond products, principally diamond grinding wheels, was the third witness who testified on behalf of the defendant. Among other things, Mr. Olivieri testified that his company had made tests of the grinding characteristics of resinoid bonded wheels made of synthetic diamond particles and those made of natural ones. He stated that tests of 20 or 30 wheels over a period of time showed that the synthetic material was 25 percent more efficient. He attributed the difference in performance to the shape of the synthetic diamond particle and its friability, that is, its ability

not to fracture in large pieces, but to wear away by attrition in very small amounts. Mr. Olivieri explained that the synthetic always presents a sharp cutting edge to the material being ground; it will not pull out of the bond as the natural particles will; it does not polish very readily, and the amount of heat generated is much less.

Mr. Koebel testified that he agreed with the following statement:

Comparative tests between man-produced diamonds and natural diamonds when employed in a grinding wheel have indicated some differences related to the particular diamond crystal man-produced or natural, but very little difference relative to the wearing away or loss characteristics of the diamond particles from the wheel matrix.

The first question to be considered is whether the term "diamond dust," as used in paragraph 1668, is limited to natural diamond dust, that is, diamond dust obtained from natural diamonds.

The Bureau of Customs found that the paragraph did not include synthetic diamond dust, stating:

The wording of paragraph 1668 is strongly persuasive that the paragraph is limited to diamonds in the forms there provided for in their natural state only. This would preclude the direct classification of synthetic diamond dust under that free provision.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

There is too much uncertainty on both the facts and the law to warrant the classification of synthetic diamond dust as diamond dust under paragraph 1668 on the principle of such decisions as the camphor case (T.D. 29077).

Plaintiff claims, however, that paragraph 1668 covers at least four distinct categories of merchandise and that the reference to natural state and form appear only in the first category. Defendant argues that the intent in separately designating diamond dust, miners' diamonds, etc., was to permit free entry for such items, notwithstanding that they may have resulted from articles previously named having been advanced in condition or value; that Congress referred only to such materials as could be advanced in value or condition from their natural state, and intended paragraph 1668 to encompass materials or articles solely of natural origin.

Diamonds have been included in various tariff acts for over a hundred years, but the term diamond dust" first appeared in the Tariff Act of 1883 on the free list, and continued on the free lists in the acts of 1890, 1894, 1897, and 1909. It was made dutiable in the acts of 1913 and 1922 at the rate of 10 per centum ad valorem, and was restored to the free list in the 1930 tariff act.

The provision in the Tariff Act of 1897 has been before the court on several occasions. *United States* v. *Fifteen Drilled Diamonds*, 127 Fed. 753, 7 Treas. Dec. 295, T.D. 25046; *Sullivan Machinery Company* v. *United States*, 168 Fed. 561, 17 Treas. Dec. 267, T.D. 29649; *American Express Company* v. *United States*, 8 Treas. Dec. 275, T.D. 25565,

affirmed *United States* v. *American Express Company*, 140 Fed. 967, 9 Treas. Dec. 1074, T.D. 26490.

In the case first cited, the merchandise consisted of drilled diamonds of an inferior quality called bort, to be used in the construction of wire die machinery. The plaintiff claimed that it was entitled to free entry under paragraph 545, but the Government contended that it was dutiable as diamonds, advanced, under paragraph 435 of the Tariff Act of 1897. The court rejected the Government's argument that the distinction in the paragraphs was between diamonds that had been advanced by some process and diamonds, rough and uncut, and not advanced by any process. The court pointed out that, if the merchandise had been diamond dust, the demand for duty could have been made with equal emphasis. The court held the merchandise was not dutiable, stating:

* * * It would seem that in paragraph 545 diamonds, under certain conditions, are placed upon the free list, and then, fearful lest certain articles, which it intended to exempt from duty, might by construction be held not to have fallen within the prescribed conditions, the Congress added the words from "process" to the end of the paragraph.

In *Sullivan Machinery Company* v. *United States*, *supra*, it was held that the qualifying words following "other precious stones," to and including "other process," refer only to the preceding phrase "diamonds and other precious stones," and that miners', glaziers', and engravers' diamonds, whether whole or split, are free of duty if they are not set.

The merchandise in *American Express Company* v. *United States*, *supra*, consisted of bort pierced by a process of drilling. It was held entitled to free entry under paragraph 545, Tariff Act of 1897, the court stating:

* * * Miners', glaziers', and engravers' diamonds, although cut to some extent for the purpose of giving a superior cutting surface to the stones, are nevertheless free under paragraph 545, if not set, and, finally diamond dust is neither capable of being cut nor set; hence it would seem that the limitations applying to diamonds of the first kind are not alike applicable to those of the second description. Certainly they do not apply to diamond dust or bort. It is obvious that Congress intended that a class of merchandise not produced in this country and which is used exclusively for industrial purposes, should be exempt from duty, and we cannot suppose that miners, engravers, and glaziers are to be the sole beneficiaries of the tariff act.

The bort in question was designed for use of wire makers—a very important industry in this country—and, as shown by the testimony, is in the crudest form in which bort can be imported for that purpose. * * *

The evidence further shows that the diamonds in dispute are commercially known as drilled bort, and inasmuch as this substance is provided for in paragraph 545 without qualifying words, it follows that a prefix added to the word "bort" does not exclude it from entry under this paragraph. * * *

In the succeeding tariff act (1909), diamond dust was included in a separate paragraph from that covering rough or uncut diamonds, not advanced from their natural state. In the acts of 1913, 1922, and 1930, it was included in the paragraphs covering such diamonds, but always at the end of the paragraph, so that the clause limiting diamonds and other precious stones to those not advanced from their natural state did not apply. *Hensel* v. *United States*, 3 Ct. Cust. Appls. 117, 118, T.D. 32366; *Borgfeldt* v. *Erhardt*, 41 Fed. 102.

Both grammatically and by judicial construction, the words in paragraph 1668, "not advanced in condition or value from their natural state by cleaving, splitting, cutting, or other process, whether in their natural form or broken," do not apply to "diamond dust." The legislative history also indicated that "diamond dust" was considered by Congress as a separate commodity, since it was sometimes provided for in a paragraph entirely separate from the one covering rough and uncut diamonds, not advanced in value or condition.

The words "natural state" and "natural form" are not appropriate to the commodity known as "diamond dust" since diamond particles of the size ranges of that commodity are not found in nature but are the result of the cutting or faceting of larger diamonds or the crushing of bort.

Although Congress was aware, prior to 1930, that diamonds had been made artificially, it did not confine the provision for diamond dust to such as was produced from natural diamonds.

The provision for diamond dust in paragraph 1668 is an *eo nomine* one. As was stated in *A. N. Deringer, Inc.* v. *United States*, 38 Cust. Ct. 327, 330–331, C.D. 1882, "Generally, an unqualified provision for a given article includes such named article made by artificial means, unless there is a manifested contrary legislative intention, commercial designation, long-continued administrative practice, or legislative approval of judicial construction. *Joseph Weiss Co., Inc.* v. *United States*, 31 Cust. Ct. 17, C.D. 1539 (artificial corundum) ; *Larzelere & Co.* v. *United States*, 8 Ct. Cust. Appls. 64, T.D. 37198 (artificial corundum) ; *Jacob J. Vollrath Manufacturing Company* v. *United States*, 7 Treas. Dec. 190, T.D. 24990 (artificial cryolite) ; *Roessler & Hasslacher Chemical Co.* v. *United States*, 30 Treas. Dec. 61, T.D. 36077 (synthetic cryolite) ; *Wm. Pickhardt & Kuttroff* v. *United States*, 1 Treas. Dec. 641, T.D. 20925 (synthetic indigo) ; *Klipstein & Co.* v. *United States*, 4 Ct. Cust. Appls. 510, T.D. 33936 (indigo paste, produced from synthetic indigo) ; *Cochrane* v. *Badische Anilin & Soda Fabrik*, 111 U.S. 293 (artificial alizarine) ."

In the *Deringer* case, it was held that the terms "india rubber," "hard rubber," and "synthetic rubber," as used in the tariff act, were distinguishable and had narrower meanings than the word "rubber,"

used without qualification. The latter term was held to include rubber produced by artificial means, provided it was the same substance or had the essential characteristics and qualities of the material known as rubber, or was known in the trade as rubber. The record established that tires in part of synthetic rubber were considered to be rubber tires by those engaged in buying and selling them and that there was no difference between tires in chief value of natural rubber and those in chief value of natural and synthetic rubber combined. It was, therefore, held that the latter were classifiable as in chief value of rubber.

There are two cases in which synthetic rubies were held not to be classifiable as natural rubies would have been. *S. Nathan & Co., Inc.* v. *United States*, 37 CCPA 99, C.A.D. 426, and *Harry W. Friedland* v. *United States*, 33 Cust. Ct. 6, C.D. 1626. In the *Nathan* case, it was held that synthetic rubies and synthetic sapphires were not classifiable directly under the *eo nomine* provision in paragraph 1528 of the Tariff Act of 1930 for "diamonds, coral, rubies, cameos, and other precious stones." The court pointed out that the record fell short of proving that they should be so classified since the witness stated that synthetic stones were sold as such and not as genuine or natural stones and that the term precious stones applied solely to genuine or natural stones. It was held that the imported articles were not enumerated in the tariff act but, since they most resembled rubies and other precious stones enumerated in paragraph 1528, they were classifiable under that paragraph, by similitude.

In the *Friedland* case, it was held that synthetic rubies were classifiable under paragraph 214, Tariff Act of 1930, as articles composed of mineral substances rather than free of duty as precious stones, rough or uncut, and not advanced in condition or value from their natural state under paragraph 1668. The court stated (pp. 10–11) :

The trouble with the contention of counsel for the plaintiff is that the term "rubies" is not mentioned in paragraph 1668. In every one of the cases cited above, the synthetic article was held dutiable under the *eo nomine* provision for the natural article. Unfortunately for plaintiff's position here, we do not have that state of facts.

Counsel for the Government contends that paragraph 1668 provides for precious stones in a rough or uncut condition, not advanced in value from their natural state, and, therefore, contemplates only the natural precious stones and not synthetic precious stones. It is argued that a precious stone cannot be both synthetic and natural and, since the similitude clause has no application, inasmuch as the merchandise is a mineral substance and so provided for under paragraph 214, cases involving *eo nomine* designations, cited by the plaintiff, are inapplicable.

We are of the opinion that inasmuch as paragraph 1668 fails to provide *eo nomine* for rubies, without regard to their condition, but rather provides for precious stones in a natural state, the synthetic rubies in question are more specifically provided for as articles, wares, and materials, composed wholly or

in chief value of mineral substances, under paragraph 214, as assessed by the collector.

Diamond dust is not a stone, precious or otherwise. Therefore, the decision in the *Nathan* case which was based on the fact that synthetic stones were not regarded as precious stones is not controlling. Neither is the *Friedland* case, since there is an *eo nomine* provision in paragraph 1668 for diamond dust, without regard to its condition. Thus, it is appropriate to apply the general rule, namely, that synthetic diamond dust is properly classifiable as diamond dust provided it has the essential characteristics and qualities of natural diamond dust.

The instant protest was submitted for decision with the companion protest of *Christensen Diamond Products Co.* v. *United States*, 54 Cust. Ct. 221, C.D. 2537, decided herewith. The instant case involves the same type of merchandise and raises the same issue which was before us in the *Christensen* case. In the *Christensen* case, also decided today, we held that an importation of 100 carats of synthetically produced diamond particles in the size range, 80/100 mesh, was properly classifiable as claimed under the *eo nomine* provision for diamond dust in paragraph 1668, on the record there made.

The record in the case now before us consists of a stipulation of facts concerning both natural and synthetic diamonds generally, testimony of five witnesses, and numerous exhibits—both physical and documentary. By and large the evidence at bar is of the same general nature as that adduced in the *Christensen* case. In fact, some of the witnesses who testified in the instant case on behalf of both parties, also testified in the *Christensen* case and substantially reiterated the testimony which was elicited from them in this case.

Moreover, the areas of dispute between the parties at bar are the same as are the areas of dispute between the parties in the companion *Christensen* case, namely, the commercial significance of variations in crystal strength and structure of diamond particles, if any, which are traceable to the origin of the diamond, and the meaning accorded to the term "diamond dust" in and prior to 1930. It is to these areas that the testimonial evidence now before us is directed.

There are, however, some noteworthy points of difference between the record as developed in the *Christensen* case, and the record in the case at bar. In the *Christensen* case, considerable testimonial evidence was adduced on scientific and technical aspects of diamond as mined and synthetically produced diamond particles. Less of such testimony is presented in the instant record. The parties here have presented agreed statements of fact concerning the historical, scientific, and technical aspects of diamond, both natural and synthetic, which they deemed pertinent to the issue and beyond the area of dispute. And the testimonial evidence at bar was drawn almost entirely from persons in

the industrial diamond industry. Furthermore, there is an additional development in the testimonial evidence at bar which we declined to take cognizance of for procedural reasons in the *Christensen* case, although similar evidence was there offered in rebuttal but was stricken on motion of the defendant. Such evidence consists of evidence of the customs treatment of natural and synthetic diamond particles subsequent to the enactment of the Tariff Act of 1930. And one other difference between the two cases is to be found in the variance in the sizes of the particles involved. In the *Christensen* case, the particles were of one size only—80/100 mesh. Here, the particles are of two sizes, namely, 60/80 mesh and 140/170 mesh.

Do the differences between the two cases warrant a different result here? Bearing in mind that the arguments advanced by counsel in support of their respective contentions here are essentially the same as those urged before us in the *Christensen* case, and taking into consideration the differences between the records of the two cases as well as the similarities, we find that we are unable to discover anything in the instant record which would warrant a result different from that reached in the *Christensen* case. Even the matter of the differential in particle size between the two cases has been considered in the *Christensen* case, where, because of the absence of specimens of imported material in the 80/100-mesh-size category, we were obliged to and did view and rule upon specimens of imported diamond particles in the larger 60/80-mesh-size category, among others, which had been borrowed from the evidence in the case at bar and introduced into evidence in that case. There, we found from visual inspection, apart from other considerations, that synthetic diamond particles in the 60/80-mesh-size category were within the common ordinary meaning of the term "diamond dust," as used in the statute. We make the same findings here.

We are of the opinion that there are no conclusions in *Christensen Diamond Products Co.* v. *United States, supra,* concerning synthetically produced diamond particles in the mesh sizes created and intended for use in industrial or abrasive applications which would not apply equally as well to the facts and evidence adduced in the instant case. The evidence at bar establishes that natural diamond particles of the size ranges here involved were recognized and designated in the trade in and prior to 1930 as "diamond dust," and that the synthetic diamond particles of the subject importation are essentially similar to natural diamond particles of the same size ranges in composition, use, and appearance. Consequently, we find and hold that the subject merchandise is "diamond dust," as that term is used in paragraph 1668, and is entitled to classification under such tariff provision. The pro-

test claim to paragraph 1668 classification is sustained, and all other protest claims, having been abandoned, are dismissed.

Judgment will be entered accordingly.

CONCURRING OPINION

DONLON, Judge: I concur in the result.