(C.D. 2551)

DIAMOND TOOL RESEARCH COMPANY, INC. *v.* UNITED STATES (CHRISTENSEN DIAMOND PRODUCTS CO., PARTY IN INTEREST)

United States Customs Court, Third Division

(Decided June 30, 1965)

*Donald Hiss, David S. Geldzahler,* and *D. Ray Owen* (*Donald Hiss* and *Edward I. Selig* of counsel) for the plaintiff.

*Andrew P. Vance,* Chief, Customs Section, Civil Division (*Glenn E. Harris,* trial attorney), for the defendant.

No attorney for party in interest.

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) as *amicus curiae.*

Before DONLON, RICHARDSON, and FORD, Judges; DONLON, J., dissenting

RICHARDSON, Judge: This is a protest proceeding which was filed by the plaintiff as an alleged American manufacturer, producer, or wholesaler under the provisions of 19 U.S.C.A., section 1516 (section 516, Tariff Act of 1930, as amended), to review the collector's classification of merchandise imported at Denver, Colo., from Ireland by the party in interest. The merchandise of the involved importation consists of 30 carats of synthetically produced diamond particles in the size ranges of 60/80, 80/100, and 100/120 mesh. The merchandise was classified in liquidation under 19 U.S.C.A., section 1001, paragraph 214 (paragraph 214, Tariff Act of 1930), as modified by T.D. 51802, as an earthy or mineral substance, wholly or partly manufactured, and assessed with duty at the rate of 15 per centum ad valorem.

It is claimed by the plaintiff that the merchandise should be classified under the duty-free provision for "diamond dust" in 19 U.S.C.A., section 1201, paragraph 1668 (paragraph 1668, Tariff Act of 1930), or, alternatively, under the dutiable provision for "artificial abrasives" in 19 U.S.C.A., section 1001, paragraph 1514 (paragraph 1514, Tariff Act of 1930), as modified by T.D. 52739. Defendant attacks plaintiff's status as an American manufacturer, producer, or wholesaler of merchandise of a class or kind as that imported, in consequence of which, plaintiff is put to its proof on the jurisdictional issue that it is such an American manufacturer, producer, or wholesaler. *The Manufacturers and Producers of Goat, Sheep and Cabretta Leathers, etc.* v. *United States,* and *Pellis, Inc., et al., parties in interest,* 21 CCPA 591, T.D. 46996. And the evidence presented at the trial addresses itself to the issue of whether plaintiff is an American manufacturer, producer, or wholesaler of diamond dust.

One Charles Baumgold testified on behalf of the plaintiff. He testified that he has been president of the plaintiff company, which was incorporated under the laws of the State of New York in 1951, since about 1941; that the company's principal place of business on August 30, 1963 (the date of filing of the protest), was and is now, 580 Fifth Avenue, New York City; that other places of business are located at 380 Second Avenue, New York City, and in Los Angeles; and that as president he is in charge of purchasing, sales, and "manufacturing" activities of the corporation (R. 18–19).

Mr. Baumgold stated that during the period January 1, 1963, through August 30, 1963, his firm "dealt" in natural diamond "dust" in the sense that it imported or purchased bort and crushed it, graded, and shaped the diamond particles and sold them "in the various sizes" in the sense that it reclaimed used diamonds "which then would be processed"; and in the sense that it purchased "powder" and reground and resold it "in the form we purchased it" (R. 17). The witness

also stated that his firm resold the natural diamond "dust" which it obtained from crushing bort to "other manufacturers of diamond tools," and that it also used such material "in diamond products, such as grinding wheels" and in diamond compounds, dressing tools, and mining bits made by his firm, which were in turn sold to plants which use them (R. 22–23, 29).

Mr. Baumgold testified that his firm purchased synthetic diamond particles of domestic origin (General Electric Co.), and imported synthetic particles (English and Swedish); and that his firm used both natural and synthetic particles in grit and micron sizes in its "manufacture of industrial diamond products" at its facilities at 380 Second Avenue in New York City (R. 23–24, 29–30, 32–33). He stated that his firm sold natural and synthetic diamond particles of grit and micron sizes to "customers," who, in turn, incorporated them into industrial diamond products such as grinding wheels and compounds for resale to industrial users (R. 26–29, 33). He also stated that his firm obtained bort "from foreign and domestic sources" (R. 33), and that it purchased its synthetic diamond particles from the General Electric Co.'s distributor, the Van Itallie Corp.; and from Engelhard Hanovia, who deals in imported products.

On cross-examination, Mr. Baumgold testified that his firm carries on sales and purchasing activities through subsidiary or "affiliated" companies in Belgium, England, and Japan, and specifically that it has an "affiliate" in Belgium which purchases rough diamonds, polished diamonds, diamond powder, bort, and other diamond materials (R. 38–39, 46); that the stock of the plaintiff is wholly owned by a corporation known as "Baumgold Brothers," which is engaged in the "diamond business" (R. 40–41); that the material purchased abroad by the plaintiff included bort, although, during the period January 1, 1963, through August 30, 1963, plaintiff had purchased all its bort from Engelhard Hanovia rather than directly importing it; and that all the bort used by the plaintiff was of foreign origin (R. 47–49).

Mr. Baumgold described "compounds" as a grease-like substance acting as a carrier for synthetic or natural diamond particles of carefully graded sizes, the compound being used for various polishing purposes. He stated that the process involved in making such compounds consisted of the careful grading of the diamond particles, homogenous mixing of the particles with the carrier, coloring, and packaging; and that at the conclusion of these steps the compound was ready for its ultimate use. When asked how his firm converted bort into grit and micron-size particles, Mr. Baumgold stated that the details of the process were "secret" but acknowledged that the "traditional equipment" for such crushing was simply a mortar and pestle, that the equipment used in such crushing was not similar to the presses

used in the synthesis of diamond particles, and that some of the diamond grinding wheel manufacturers do their own crushing of bort.

Mr. Baumgold acknowledged that he had referred to the sales records of his firm just prior to the trial, and that those records were located at the firm's places of business in New York City. He stated that, during the period January 1, 1963, through August 30, 1963, his firm purchased 4,825 carats of General Electric synthetic diamond particles from the Van Itallie Corp. The witness acknowledged that "some" of the material was used by his firm in diamond grinding wheels and other products. He stated that it "would be difficult, almost impossible" to ascertain how much (R. 59). Mr. Baumgold also testified that during the same period he had purchased 3,970 carats of synthetic diamond particles from Engelhard Hanovia (R. 65). He was unable to cite any data from his firm's records as to the amount of sales of natural, domestically produced synthetic, or imported synthetic diamond particles (R. 61–67).

There was also received in evidence during Mr. Baumgold's testimony a publication (plaintiff's exhibit 1) which Mr. Baumgold described as a catalog describing the diamond wheels which were produced by the plaintiff (R. 36–38). Before the court also is the record in *Christensen Diamond Products Co.* v. *United States*, 54 Cust. Ct. 221, C.D. 2537, decided June 3, 1965, which was incorporated in the record of this protest proceeding.

Defendant called upon two witnesses to give testimony. One John D. Van Itallie, president of the Van Itallie Corp. of New York City, testified that his firm is a wholesaler of natural and synthetic industrial diamonds, and is a distributor of the synthetic diamond particles manufactured by the General Electric Co. He stated that he is engaged in the buying and selling of the products in which the firm deals. Through the witness, there was received in evidence as defendant's exhibit B, a catalog of specifications for the General Electric synthetic diamond particles. Mr. Van Itallie stated that the catalog had been distributed to the trade, including manufacturers of diamond grinding wheels. He further testified that all sales of the firm during the period January 1, 1963, through August 30, 1963, had been made in accordance with the catalog provisions.

One Warren M. Colehamer, a sales and administrative assistant with Engelhard Hanovia, Inc., of Newark, N.J., also testified on behalf of the defendant, and produced, pursuant to subpoena, records of his company pertaining to sales transactions between his company and the plaintiff. It was brought out during the court's examination of Mr. Colehamer that, in August 1963, Engelhard Hanovia shipped to the plaintiff 480 carats of diamond dust in three size categories, and that this shipment was based upon a contract entered into by the two firms

in October 1962, wherein plaintiff placed a 10,000 carat order with Engelhard Hanovia (R. 101). Objection was taken by plaintiff's counsel to testimony of the witness pertaining to sales prices to other customers of Engelhard Hanovia during the period July 15, 1963, and August 30, 1963 (R. 106), and the court reserved decision on its ruling for disposition with the decision in the case. The foregoing comprises the substance of the evidence before the court.

The objection of plaintiff's counsel to testimony given by Mr. Colehamer regarding sales prices to customers of Engelhard Hanovia other than the plaintiff during the period between July 15, 1963, when he joined the company, and August 30, 1963, is well taken. Mr. Colehamer admitted, on cross-examination, that the first 2 months were spent by him in an orientation program, and that during this period he was not concerned with sales and did not know about prices. Hence, his prior testimony to the effect that, for the period between July 15, 1963, and August 30, 1963, discounts were not allowed to large purchasers over small purchasers, is without any foundation based upon the witness' personal knowledge, and is not reflected in the records of the company which the witness produced under subpoena. We, therefore, grant plaintiff's motion to strike such testimony. This is all that plaintiff seeks in its motion.

The issue to be resolved in the instant case is whether the imported merchandise is of the same class or kind of merchandise that is *manufactured, produced,* or *sold* at *wholesale* by the plaintiff within the meaning of section 1516. Stated another way the issue is, is plaintiff an *American manufacturer, producer,* or *wholesaler* of merchandise of the same class or kind as the imported merchandise?

Section 1516(b) does not undertake to define the meaning of the words *American manufacturer, producer,* or *wholesaler,* as used in the statute, and the plaintiff has not produced evidentiary facts to establish their meaning in the trade and commerce of the diamond industry in the United States. To ascertain the intention of the legislature in enacting this statute, it is necessary to examine its legislative history. The statute was first enacted as section 516 of the Tariff Act of 1922. It had been introduced and passed in the House in 1921 as section 529 of H.R. 7456,* and sent to the Senate in language, reading as follows:

Sec. 529. APPEAL OR PROTEST BY AMERICAN PRODUCERS.

Whenever it shall appear to the satisfaction of a board of three General Appraisers that it is impracticable for a manufacturer or producer in the United States to make, in his own name, or by agent, an importation of merchandise for the purpose of having determined the dutiable value or classification thereof, such manufacturer or producer shall have the right to appear and to be heard as a party in any case involving the disputed question of fact or law; or, in the

---

*S. Doc. 187. 67th Cong., 2d sess., p. 151.

absence of such a case, the manufacturer or producer, or the Assistant Attorney General in charge of customs litigation for the Government, may state in a written notice to the appraiser or the collector what he claims to be the proper value or classification, as the case may be, of such merchandise, and if the appraiser or the collector shall not accept such valuation or classification as correct, such manufacturer, producer, or Assistant Attorney General shall have the right to appeal for reappraisement or to make a protest, and to be heard as a party, the same as the importer would have, in any subsequent appraisal or classification involving the same question of fact or law. No manufacturer or producer shall have the right to inspect any documents or papers disclosing any information which the General Appraiser or the board of three General Appraisers shall deem improper to be disclosed to him. In every such proceeding the importer or his agent shall be notified by the manufacturer, producer, or Assistant Attorney General, whichever is the moving party, of his intention to appear and shall be apprised of all hearings in accordance with the rules of procedure.

In reporting the bill out of committee, the majority report of the House Ways and Means Committee stated the purposes of the changes contemplated by the general tariff revision proposed in the bill. Among other things, the report states (p. 21) ** :

The necessity for this remedial legislation is accentuated by after-war conditions which have resulted in the depreciation in the value of the currency of the nations of Europe in general. The effect of depreciated currency has been to reduce production costs in many countries with whose products *American goods* must compete. It is against these countries that protection is most needed. [Italics added.]

In commenting upon the language of section 529 of the bill in particular, the report goes on to say (p. 26) :

The right of protest against the rate or amount of duty as being too low, which was in the law prior to 1913, has been restored and extended to give American manufacturers and producers an opportunity to be heard upon matters of value and classification of imported merchandise directly affecting their interests.

Section 529 of H.R. 7456 as drafted by the House and sent to the Senate was amended by the Senate which substituted its own version of the statute for the House version under a new section 516. In proposing the amendment, the Senate had no quarrel with the House concerning reasons for and objectives underlying the proposed legislation. The Senate took the position that the provisions of the House section 529 were susceptible of doubtful interpretation, and that its own section 516 provided a more detailed and practical method of getting the facts before the appraising officers, and assured a proper notice to opposing parties and the privacy of documents and papers.*** In addition, the Senate amendment also extended the privilege of intervention in customs litigation to American wholesalers. The House acquiesced in the Senate amendment and the pro-

** H. Rept. 248, 67th Cong., 1st sess., pt. 1.
*** H. Repts. 1207, 1223, 67th Cong., 2d sess., p. 157.

visions thereof became law as written into the Tariff Act of 1922. The pertitnent provisions of section 516 of that act read as follows:

(b)  The Secretary of the Treasury shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification of and the rate of duty, if any, imposed upon designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary of the Treasury setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief. If the Secretary believes that the classification of or rate of duty assessed upon the merchandise is not correct, he shall notify the collectors as to the proper classification and rate of duty and shall so inform such manufacturer, producer, or wholesaler, and such rate of duty shall be assessed upon all merchandise imported or withdrawn from warehouse after thirty days after the date of such notice to the collectors. If the Secretary believes that the classification and rate of duty are correct, he shall so inform such manufacturer, producer, or wholesaler. If dissatisfied with the action of the Secretary, such manufacturer, producer, or wholesaler may file with him a notice that he desires to protest the classification or the rate of duty imposed upon the merchandise, and upon receipt of such notice the Secretary shall furnish him with such information as to the entry, the consignee, and the port of entry as will enable him to protest the classification of or the rate of duty imposed upon the merchandise when liquidated at any port of entry. Upon written request therefor by such manufacturer, producer, or wholesaler, the collector of such port of entry shall notify him immediately of the date of liquidation. Such manufacturer, producer, or wholesaler may file, within sixty days after the date of liquidation, with the collector of such port a protest in writing setting forth a description of the merchandise and the classification and the rate of duty he believes proper, with the same effect as a protest of a consignee filed under the provisions of sections 514 and 515 of this Act.

(c)  A copy of * * * every protest filed by an American manufacturer, producer, or wholesaler under the provisions of this section shall be mailed by the collector to the consignee or his agent within five days after the filing thereof, and such consignee or his agent shall have the right to appear and to be heard as a party in interest before the Board of General Appraisers. The collector shall transmit the entry and all papers and exhibits accompanying or connected therewith to the Board of General Appraisers for due assignment and determination of * * * the proper classification and rate of duty. The decision of the Board of General Appraisers upon any such * * * protests shall be final and conclusive upon all parties unless an appeal is taken by either party to the Court of Customs Appeals, as provided in section * * * 515 of this Act.

(d)  In proceedings instituted under the provisions of this section an American manufacturer, producer, or wholesaler shall not have the right to inspect any documents or papers of the consignee or importer disclosing any information which * * * the Board of General Appraisers shall deem unnecessary or improper to be disclosed to him.

Section 516 of the Tariff Act of 1922 was superseded by similar provisions of section 516 of the Tariff Act of 1930, and repealed by section 651 (a) (1) of the 1930 act. It is the provisions of 19 U.S.C.A., section

1516 (section 516, Tariff Act of 1930, as amended), as previously indicated herein, which govern the instant protest proceeding.

It is palpably clear from the legislative history of the statute in question that in its enactment into law Congress was concerned with *domestic merchandise in channels of commerce in this country*, and with the competition such merchandise faced from like merchandise imported into this country from foreign countries. And for the benefit of persons who placed such merchandise in domestic channels of commerce, namely, manufacturers, producers, and wholesalers, Congress undertook to open and extend to them the judicial forum as a means of enabling them to protect their own interests. Viewed in such light, the statute make the character of the merchandise placed by the plaintiff in domestic channels of commerce the controlling factor in determining whether plaintiff is an American manufacturer, producer, or wholesaler. Does plaintiff make or produce diamond dust in commercially available quantities in this country, or sell at wholesale here such domestically made or produced diamond dust? Is the diamond dust handled by the plaintiff of the same class or kind as the imported diamond dust? The resolutions of these key questions are, in our opinion, determinative of the application of section 1516 in the instant protest proceeding. The court has a responsibility to interpret the statute in a manner which gives full expression to the legislative intent behind the statute and avoids the frustration of that intent.

The evidence discloses that the manufacture and selling of diamond tools is clearly the business of the plaintiff. Among other things, plaintiff claims, on the basis of such evidence, that it is deemed to be a manufacturer or producer of diamond dust because it uses diamond dust in the manufacture of tools. This argument is untenable. The designing and creation of tools and the orientation of the diamond edge to such tools is an undertaking apart from the business of the handling of the abrasive diamond particles themselves. One who acquires an article and converts it into something else cannot be regarded as a dealer in the article as it existed prior to the conversion. See *Florida Packing & Ice Co.* v. *Carney*, 51 Fla. 190, 41 So. 190, holding that fresh meat is not the same as smoked and salted meat (citing the example where one who buys lumber and converts it into furniture cannot be regarded as a dealer in "lumber"). Consequently, one whose business activities earns him a reputation as a diamond tool designer and maker would not, by virtue of such activities, be known or regarded as being a maker or producer of diamond dust because the dust is a component of the tool. Section 1516 as applied to the facts of this case is concerned with the commodity diamond dust.

All that the court knows about plaintiff's business activities insofar as its dealings in diamond dust are concerned is what it says about

itself, and this is very little, and is confined to general statements, appellations, and broad conclusions. The mere declaration of an essential ultimate fact in issue, unsupported by evidentiary facts, is not substantial evidence of the fact to be proved. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495. There is nothing in the record to establish what the trade regards as a manufacturer, producer, or wholesaler of diamond dust in terms of the volume of merchandise created, handled, and distributed, and the manner in which such merchandise is handled and distributed in the trade. There is no demonstrative evidence such as the volume of plaintiff's business, its stocks, inventories, catalogs, advertising matter, what it sells, to whom it sells, how often, and in what units of quantity. It is impossible to show domestic merchandise moving in channels of commerce in this country without disclosing evidence of such things.

The record in the incorporated case of *Christensen Diamond Products Co.* v. *United States, supra*, does not support plaintiff's claim that it is a producer of diamond dust within the requirements of section 1516. On direct examination, three sentences from a speech delivered by Charles Baumgold were admitted into evidence (R. 82). On redirect examination, plaintiff put a copy of the speech into evidence as exhibit 16 (R. 95). The title of exhibit 16 is "Diamond Abrasives," by Charles Baumgold and Matthew Safferson. Just who Matthew Safferson is or what contribution he made to the speech is not indicated.

In next to the last paragraph on page 5 of exhibit 16, it is stated that "We make eight standard grades of micron powder this way * * *." The last paragraph states "We also custom grade ten or more sizes to suit the specific needs of our customers." Just who is meant by the word "We" is not indicated. Does "We" refer to Baumgold and Safferson, Diamond Tool Research Co., Inc., or one of Baumgold's subsidiaries in this country or in Europe, or the trade itself? The tenor of exhibit 16 is objective and general.

Also, it is submitted that the word "make" in next to the last paragraph on page 5 has the same meaning as the expression "custom grade" in the last paragraph on page 5, as what is described immediately above these two paragraphs and to which they relate, are methods of separation, sizing, grading, and controlling the sedimentation of diamond dust particles for use in the manufacture of diamond wheels. There is no showing that plaintiff produced the diamond dust particles with which the process of separation, sizing, grading, and controlled sedimentation was begun.

If "We" in exhibit 16 refers to Diamond Tool Research Co., Inc., the statement that "We also custom grade ten or more sizes to suit the specific needs of our customers" is at variance, at least in part, with Mr. Baumgold's statement, in the incorporated case, that "* * * our purchases [of diamond grit] are very large and in bulk, * * *" [and]

"we don't grade it, we put the same letters on that the one who sold it to us does." (R. 76.)

No one questions Mr. Baumgold's knowledge of the diamond industry. The plaintiff just has not made a record upon which a decision can be made for the plaintiff without saturating it with assumptions. Plaintiff is not entitled to invoke the trade secrets doctrine to obviate the giving of evidence on matters directly in issue. The mere fact that information is communicated to a witness in confidence or under a promise of secrecy does not create a privilege. Richardson, Evidence (9th ed.), section 470. "No pledge or privacy, nor oath of secrecy, can avail against demand for the truth in a court of justice." Wigmore, Evidence, section 2286. Either plaintiff is doing a business which it claims to be doing, or it is not. And the offering of broad, general, and conclusory statements is not convincing, if indeed it is evidence, that plaintiff is doing such a business.

Mr. Baumgold and his counsel were advised by the court that Mr. Baumgold's testimony had not satisfactorily informed the court of who is a "producer, manufacturer, or wholesaler" in the diamond dust trade; and inquiry was made as to just how his company qualified in one or more of the three categories (R. 70–72). The plaintiff's counsel replied that it expected to dispel the question in its brief.

(The "Yellow Pages" for Manhattan in New York City are not in evidence and any listings in such pages are not before the court. Furthermore, such paid advertisements cannot be relied upon to the extent that they are to be accorded the credence given to proof adduced in the course of a trial.)

The evidence does indicate that, in 1963, plaintiff acquired some 4,825 carats of synthetic diamond particles from one source of supply, and some 3,970 carats of synthetic diamond particles from Engelhard Hanovia, Inc., which admittedly deals in imported diamond dust. "Such * * * purchasing * * * does not show the wholesaling of goods— which means selling at wholesale." *Board of Railroad Commissioners* v. *Sawyers' Stores*, 114 Mont. 562, 138 P. 2d 964. As to how this purchased merchandise was handled or distributed does not clearly appear in the record. Mr. Baumgold testified that the merchandise was commingled from the various sources of supply, some of it was sold to other firms in the industry, and some of it was consumed in the manufacture of its tools. How much of this material from whatever source gathered was redistributed by plaintiff in the industry, in what units of quantity and with what frequency, and how much of this material was utilized by plaintiff for its own needs, plaintiff was unable to establish by evidence.

On the record before the court, plaintiff is not entitled to invoke so far reaching a remedy as is provided for in section 1516 on such

a meager showing. In our opinion, plaintiff has not established by competent evidence that it is an American manufacturer, producer, or wholesaler within the meaning of section 1516. In view of the conclusion reached herein, it becomes unnecessary to discuss or pass upon other issues presented in this protest proceeding pertaining to jurisdiction and classification. For the reasons stated, the protest is overruled.

Judgment will be entered accordingly.

DISSENTING OPINION

Donlon, Judge: I do not agree with my learned colleagues in their decision that plaintiff has not made a *prima facie* showing, at least, of its qualification as one who is authorized to file this protest under section 516(b). The issue as to qualification is well and succinctly stated by defendant, who is the protagonist of that issue, in its brief as follows:

1. Plaintiff has made no *prima facie* showing that it qualifies as a manufacturer of merchandise of the class or kind in issue.

2. Plaintiff has made no *prima facie* showing that it qualifies as a producer of merchandise of the class or kind in issue.

3. Plaintiff has made no *prima facie* showing that it qualifies as a wholesaler of merchandise of the class or kind in issue.

4. Natural diamond particles are not merchandise of the same class or kind as synthetic diamond particles.

5. The wholesaling of imported merchandise may not form the basis of standing under section 516(b).

For these reasons, defendant argues that plaintiff has no standing to institute and maintain this protest, under section 516(b), and from that premise proceeds to argue that the court lacks jurisdiction under that statutory provision.

By leave of court, *amicus curiae*, counsel for General Electric Company, has filed a brief in support of defendant. To the extent that arguments in the brief of *amicus* deal with the issues, of fact and of law, that have been framed by the parties, I shall refer to such arguments in their proper context. To the extent that arguments of *amicus* rest on facts not of record or on issues not raised by the parties, I take up those matters later.

The parties have entered into certain stipulations. One is that the record in *Christensen Diamond Products Co.* v. *United States*, 54 Cust. Ct. 221, C.D. 2537, may be incorporated in the record here. It is incorporated.

Another stipulation is that the parties will not introduce evidence on the classification issue, other than the incorporated record and the official papers; and that they will not argue in their briefs the issue of

classification, relying on the arguments, as to that issue, made in their briefs filed in the incorporated case.

Before trial defendant moved that the protest be dismissed on the grounds, first, that plaintiff is not an American manufacturer, producer, or wholesaler within the purview of section 516(b) ; and, second, that section 516(b) does not confer a right to protest classification when the classification with which plaintiff is dissatisfied would result in reduction of the duty assessed. On review of the facts disclosed in the papers on file with the court, this motion was denied. *Diamond Tool Research Co., Inc.* v. *United States (Christensen Diamond Products Co.*, party in interest), 52 Cust. Ct. 152, C.D. 2453.

As to the first three of defendant's arguments, recited above, defendant concedes that section 516(b) does not require that plaintiff shall be a manufacturer *and* a producer *and* a wholesaler of merchandise of the same class or kind. Defendant concedes, and this is correct, that it suffices for jurisdiction that plaintiff is either a manufacturer or a producer or a wholesaler of merchandise of the same class or kind.

Defendant likewise concedes that plaintiff is American in the sense that it is a corporation organized and subsisting under the laws of the State of New York and that the principal place of its business is in New York City.

Plaintiff does not argue that it is a producer of synthetic diamond dust. It contends that it is a wholesaler and a manufacturer of synthetic diamond dust, and that it is a producer, a manufacturer, and a wholesaler of natural diamond dust.

In order to simplify consideration of the several arguments, I first take up the arguments of defendant and *amicus* that natural diamond particles and synthetic diamond particles are not merchandise of the same class or kind.

For purposes of tariff classification, I find that synthetic particles in the mesh sizes before us are diamond dust. My discussion on that point follows my discussion of the issue of jurisdiction.

Defendant's brief concedes that difference in tariff classification does not preclude a finding that merchandise satisfies the section 516(b) requirement, as being of the same class or kind as the merchandise with respect to which an American manufacturer, producer, or wholesaler files his protest. That is true. *Star-Kist Foods, Inc.* v. *United States*, 45 CCPA 16, C.A.D. 666.

Here the shoe is on the other foot. We have found identity of tariff classification. It would seem to follow that an even stronger case is made than in *Star-Kist*, for a finding that this is merchandise of the same class or kind.

In *Star-Kist*, the trial court by a majority of the division, one judge dissenting, held that tuna fish packed in oil, which is enumerated

in paragraph 718(a), is not merchandise of the same class or kind as tuna fish packed in brine, enumerated in paragraph 718(b). The dissenting judge summarized his opinion, as follows:

It seems to me that the view adopted by the majority is not warranted by even a strict construction of the American manufacturer provision of the act. I am of the opinion that the words "class or kind," as used in the statute, relate to the intrinsic nature and commercial characteristics of the merchandise, and not to its tariff classification, and should be realistically interpreted so that where, as here, plaintiff has demonstrated a legitimate and real interest in the matter the right to litigate the issue will be upheld. [*Star-Kist Foods, Inc.* v. *United States* (*Bruno Scheidt, Inc.*, party in interest), 37 Cust. Ct. 171, C.D. 1819, at p. 182.]

Our appeals court reversed the trial court and cited with approval the views of the dissenting judge.

As was pointed out in the dissenting opinion below, tariff classifications are of widely varying scope and substantial inequities might result if the right to file a protest under section 516(b) were dependent solely on the breadth of the particular classification which happened to be involved. Moreover, it frequently happens that certain goods falling under a particular paragraph are more closely related to some goods which do not fall under that paragraph than to other goods which do. Thus, tuna fish packed in oil seems clearly to differ more widely from sardines packed in oil than from tuna fish packed in brine, but the former two both fall under paragraph 718(a) while the latter falls under paragraph 718(b). The principle relied on by the majority of the Customs Court would apparently give to a producer of sardines or anchovies packed in oil the right to protest against the duty on tuna fish packed in oil, but would deny that right to a producer of tuna fish packed in brine, and yet the commercial relationship between the two types of tuna fish is clearly closer than that between either of them and sardines or anchovies.

Finally, as was also pointed out by the dissenting judge below, classification of the imported merchandise may be the very point at issue in a protest under section 516(b). If that classification also governs the right to file a protest, which classification is to be controlling, that assigned by the collector, that urged by the protestant, or that finally determined by the courts? [*Star-Kist Foods, Inc.* v. *United States, supra,* at p. 18.]

Discussing the kinds of circumstances that were deemed controlling there, our appeals court said:

In the instant case the testimony shows that wholesalers recognize a distinction between tuna fish packed in brine and that packed in oil, and place their orders accordingly, but that the two kinds are frequently "sold on the same markets and on the same shelves to the same consumers and for the same purpose." It seems evident, therefore, that any significant change in the price of one type of goods would probably have a material effect on sales of the other. [*Star-Kist, supra,* at p. 19.]

We are cited to no case in which, present an identity of tariff classification, the courts nevertheless have held such merchandise to be *not* of the same class or kind, within the intent of section 516(b); although

I recognize, as our appeals court did, that like customs classification might alone be insufficient, as, for instance, if one kind of merchandise were tuna fish in oil and the other sardines in oil. However, there is more here than mere identity of customs classification, which is the point at issue in this protest. The record before us, which includes the incorporated record, shows that tariff classification is but one of what our appeals court calls the pertinent circumstances.

Such pertinent circumstances are, to paraphrase the opinion of O'Connell, J., in *Star-Kist*, that while buyers recognize a distinction between natural and synthetic diamond particles and place orders accordingly, the two articles are frequently sold by the same dealers and to the same users for the same purpose. Coupled with the identity of tariff classification of both kinds of particles as diamond dust, these other circumstances persuade me that synthetic and natural diamond dust are merchandise of the same class or kind under section 516(b).

This brings me to the question whether, on the record before us, plaintiff has made at least a *prima facie* showing that it is either a manufacturer or a producer or a wholesaler of diamond dust, natural, or synthetic, or both. Before examining the evidence on that issue, I digress to review briefly the facts of record as to development of the industrial diamond industry. This has pertinence to the construction of terms here under definition, as those terms relate to the industry in which plaintiff is engaged.

Although diamonds have been used as abrasives for a very long time, the modern metallurgical advances, notably in processes for the hardening of steel, created an active industrial market for diamonds. As metals became harder and were adapted to more uses, there came to be more and more need for diamonds as abrasives. The diamond wheel, although previously known, was improved in modern times, as the incorporated record shows. This expanding demand for diamonds gave rise to question whether natural diamonds were available in sufficient supply for industrial demand.

This provided new incentives for experimentation with processes for synthesizing diamonds. Such experimentation was successful, both here and abroad.

Makers of the new and improved diamond bonding wheels are among the chief industrial users of diamonds, both natural and synthetic. These are business firms that grind diamonds into particles of mesh sizes suitable for diamond wheels and for other industrial uses. There are firms that buy and sell diamond particles in mesh sizes. There are firms that manufacture diamond wheels. There are firms that use diamond particles to make other abrading and polishing devices. There are, in brief outline, the principal businesses in the diamond

dust trade in which plaintiff claims to be such a manufacturer, producer, or wholesaler, as section 516 (b) contemplates.

I agree with the majority that plaintiff has not shown itself to be a manufacturer of diamond particles, in the section 516(b) context, by proofs that it uses diamond particles to manufacture diamond wheels or other products of which diamond particles are a component. The meaning of "manufacturer of" an article seems to me to be one who makes that article, rather than one who uses it to make something else.

Nor do I find that such definition renders redundant the language Congress used in section 516(b), as plaintiff argues. Some goods are manufactured, but not produced. Some are produced, but not manufactured. The distinction, in some cases, may be a narrow one; while, in other cases, there may be a considerable distinction between the concepts "manufacture" and "produce."

While we are cited to no case construing these words as they are used in section 516(b), there is consideration of similar language, used in section 313 which authorizes drawback of duty. *United States* v. *Samuel Dunkel & Co., Inc.*, 33 CCPA 60, C.A.D. 317, cited in defendant's brief. As to whether there is a difference in meaning between the words "manufactured" and "produced," as used in the drawback section, the appeals court said:

> While there is a close kinship between the manufacture of an article and the production of an article, it may well be that production is a more inclusive term. [P. 63.]

In my view, a manufacturer of diamond particles is one who manufactures such particles, and a producer of diamond particles is one who produces such particles.

No one manufactures natural diamonds. No one save the miner can be said to be the producer of natural diamonds. No one save the maker of synthetic diamonds can be either the manufacturer (or producer) of them, and in the United States the sole manufacturer or producer is General Electric Company.

But here we are concerned with diamond particles in dust sizes, and not with diamonds. Does plaintiff manufacture or produce the tariff article that is known as diamond dust? That is the question.

One line of plaintiff's business is shown to be the grinding of natural diamonds (bort) into particles of mesh sizes, such as we have held are diamond dust. *Christensen Diamond Products Co.* v. *United States*, 54 Cust. Ct. 221, C.D. 2537. Plaintiff manufactures diamond dust both to fill orders from its customers and to supply its own manufacturing needs.

The record before us includes the incorporated record in the *Christensen Diamond Products Co.* case, *supra.* The *Christensen* record

was made a part of the record herein *as to all issues*. Mr. Charles Baumgold, president of Diamond Tool Research Co., Inc., plaintiff herein, testified also in the *Christensen* case.

He located plaintiff's plant for crushing bort at 380 Second Avenue, New York City (16,000 square feet) ; its principal office at 580 Fifth Avenue; and another office in Los Angeles.

He testified that plaintiff imports or purchases diamond bort, which it crushes and grades and shapes; that it also reclaims used diamonds, and similarly processes them. Particles are then sorted to the micron sizes according to which they are offered for sale, ordered, and sold.

There were frequent references, both in this case and in the incorporated case, to the fact that trade secrecy would be infringed by disclosure of information as to prices, quantities, and the names of customers. The court took cognizance of this.

The documentary evidence includes portions of a trade paper, a speech that was delivered by Charles Baumgold (plaintiff's president) to the American Society for Abrasives at its annual National Technical Conference held in New York City, in 1963, under the auspices of the Industrial Diamond Association of America, Inc. (Exhibit 16.) The paper was prepared by Mr. Baumgold and Matthew Safferson, the latter not identified. As to this paper, Mr. Baumgold testified that when he made the speech he went a little further than what is written, but that exhibit 16 "is essentially exact."

Exhibit 16 recites on the front cover, in the place where the source of publication usually appears, Diamond Tool Research Co., Inc., Wholesale Division, 580 Fifth Avenue, New York 36, New York, and Mr. Baumgold testified that "We had it printed, the firm." The last page of exhibit 16 shows what are described as "Photomicrographs of Diamond Grits in Use Today," including both man-made and natural diamonds. These are "Pressure-Tested Natural diamond grits and powder," made by Diamond Tool Research Co., Inc., Wholesale Division, that have been subjected to a process which produces sound blocky diamonds.

In this paper (exhibit 16), published by plaintiff, plaintiff's president states, after describing manufacturing processes, that—

*We* make eight standard grades of micron powders *this way*, conforming to U.S. Bureau of Standards recommendations, 0–1, 0–2, 1–5, 4–8, 6–12, 8–22, 20–40, 30–60 microns.

*We* also custom grade ten or more sizes to suit the specific needs of our customers. [Emphasis added.]

This is the manufacture, or at least the production, of diamond dust. I see nothing in the provisions of section 516(b), or in its legislative history, which persuades me that Congress intended to make the right of protest, conferred by that section, a right available only to big business. There is no business volume in manufacture, production, or

wholesaling prescribed in order that the manufacturer, producer, or wholesaler shall be one, *engaged in that business*, on whom the protest right of section 516(b) is conferred.

The majority cite selected excerpts from Mr. Baumgold's testimony (R. 76) so as to seem to show that he testified that plaintiff merely passes along, without processing, the "diamond grit" which it purchases. I do not so read the record. I am not persuaded that the excerpted testimony relates other than to a small business in the sale of *synthetic* dust, purchased as such, and not either to plaintiff's business in dust ground from diamond bort or to its business in reclaimed synthetic dust.

On cross-examination, asked as to whether plaintiff ordinarily specifies, in buying *diamond particles* whether plaintiff wants synthetic or natural, Mr. Baumgold replied:

As I mentioned before, *our purchases are very large*, and in bulk, and *actually we don't buy much in the way of synthetics*. We create it in reclaiming. We supply some synthetics, yes sir, and because it has become the custom to many in the trade, we generally grade it—we don't grade it, we put the same letters on that the one who sold it to us does. [R. 76; emphasis added.]

Read with the entire record, this does not lead me to conclude that Mr. Baumgold was describing, at R. 76, any considerable part of plaintiff's total business as being in newly purchased synthetic dust, or that he said, other than as to such limited purchases, that plaintiff does not grade the dust which it sells.

I do not find it necessary that there be corroboration of the uncontradicted testimony which is of record. No one should be able, better than its president, to testify as to the nature of plaintiff's business. Here there is such evidence, both verbal and documentary.

That the raw materials from which plaintiff produced diamond dust, within the United States, were imported natural diamonds seems to me irrelevant to our decision. There is nothing that leads me to conclude that Congress intended in section 516(b) to describe, for example, as an American manufacturer of flour, a Minneapolis concern when its operations there involve the milling of Montana wheat, but not when it mills Manitoba wheat.

Nor do I infer that Congress included such a manufacturer within the scope of section 516(b) only when the end result of its operation is sale of the flour, but not when the flour it mills is in part used in its own further processes, to manufacture cake mixes, biscuits, rolls, cereals, etc. To infer such a limitation, not expressed, is to write into the statute language that is not there, extending judicial responsibility into the area of legislation.

Defendant cites *United States* v. *Samuel Dunkel & Co., Inc., supra*, as authority for its argument that the grinding of bort into particles is a mere change of shape or form, which does not constitute produc-

tion. In the *Dunkel* case, butter was imported from the Argentine into the United States in bulk, that is, in 56-pound blocks. After importation, the bulk butter was forced into 4-pound rolls of butter, and each roll was then cut into four equal parts, making 1-pound packages. On export, *Dunkel* claimed drawback on the ground that the butter it exported had been produced in the United States with the use of imported butter.

This court, first division, agreed with plaintiff, putting some weight on what it found was a long-continued practice of the Treasury Department, going back at least to 1924, to consider the processing of imported bulk products into individual pieces, or into consumer packages, to be such manufacture or production in the United States as to create entitlement to drawback on export. The trial court thought that reenactment of the same statute, in 1930, constituted legislative approval of what it called a long-continued administrative practice. *Samuel Dunkel & Co., Inc.* v. *United States*, 13 Cust. Ct. 223, C.D. 899.

However, as to that issue, the record showed that there was no published bulletin as to such an administrative practice with respect to butter until 1933; and our appeals court accordingly decided there could not have been, in the enactment of the Tariff Act of 1930, any legislative adoption of an administrative practice as to butter that was not shown to go back beyond 1933.

On the issue as to whether re-packaging bulk butter into smaller packages was either manufacture or production, the argument for which defendant cites it, our appeals court said:

The question of manufacture * * * is not before us for the reason that in the packing of the involved butter, no new or different article having a distinctive name, character, or use emerged. The article imported was butter, and the article exported was the same butter. It had merely been altered in form. Unquestionably it was dedicated to the usual butter uses. The fact that the print butter here involved sells for substantially more per pound than the bulk butter is immaterial. The difference in price is apparently due to the cost of labor expended upon the die-work and cans, and to a profit.

While there is close kinship between the manufacture of an article and the production of an article, it may well be that production is a more inclusive term. But giving the latter its broadest interpretation, what can be said was produced by appellee? It merely imported 56-pound cakes of butter and exported it in smaller units. Mere change of shape or form, as here, is not production. [*United States* v. *Samuel Dunkel & Co., Inc.*, *supra*, at p. 63.]

Here there is something more than mere change of shape or form. When plaintiff grinds bort to particle sizes, there emerges a new or different article having a distinctive name, character, and use. The new article is described in a different tariff enumeration.

In my opinion, this is the manufacture, or the production, of an article of commerce known as diamond dust, and I would so hold.

While there is no evidence that plaintiff's business includes the grinding of synthetic diamonds to particle sizes, other than reclaimed synthetics, we have held that natural diamond dust and synthetic diamond dust are merchandise of the same class or kind.

Having found that plaintiff is a manufacturer or producer of natural diamond dust, it is not necessary to find whether or not plaintiff is also a wholesaler of diamond dust, synthetic or natural or both.

However, it should be noted that there is evidence that plaintiff maintains and operates a wholesale division and that it sells diamond particles to customers, both those who use it in their manufacturing processing and those who re-sell it.

The majority mention, parenthetically, the classified telephone directory. It is well established that courts may resort to publications to throw light on the definition of terms and commercial practices. While not necessarily persuasive, they may be helpful. In the "Yellow Pages" for Manhattan, in New York City, mentioned by the majority, there are approximately three columns of listings under the heading "Diamonds—Industrial." The competitive nature of the business is apparent. There are two listings for plaintiff. One is at 380 Second Avenue, with the statement: "Bits—Blades—Tools—Wheels—*Powder*-Hones." [Emphasis added.] The other is at 580 Fifth Avenue, described as *"Wholesale* Division." [Emphasis added.]

It also is not necessary to decide whether, as defendant argues, the wholesaling of imported merchandise is not such a wholesale business as section 516(b) intends. It is enough that plaintiff has been shown to be an American manufacturer or producer of diamond dust.

I turn next to the issue defendant argued on the pre-trial motion to dismiss this protest for lack of jurisdiction. The ground then asserted, as denying jurisdiction, was that section 516(b) does not authorize protest by an American manufacturer, producer, or wholesaler who is dissatisfied because classification of imported merchandise results in duty at too high a rate, claiming either a lower rate or duty-free classification, as here.

Defendant relies here on its arguments advanced in support of its pre-trial motion, expressing in its brief the belief that trial of the case has rendered this issue "all but moot." (Defendant brief, p. 22.)

The pre-trial motion was denied. *Diamond Tool Research Co., Inc.* v. *United States (Christensen Diamond Products,* party in interest), 52 Cust. Ct. 152, C.D. 2453.

I do not repeat here our opinion on denial of the motion to dismiss. I affirm the views there stated.

However, in support of this issue of jurisdiction, *amicus* argues a point that was not argued by defendant. *Amicus* argues that section

516(b) requires that every protest claim shall state some duty rate, and that a claim to duty-free entry is not authorized. Building on his own argument, *amicus* further argues that if a claim to duty-free entry is not authorized, it follows that claim to reduced duty is not authorized.

In support of this argument, *amicus* cites selected language from section 516(b). It is a rule of construction that statutory language is to be interpreted in its context. In *Atkins* v. *The Disintegrating Company*, 85 U.S. 272, the Supreme Court stated the rule, as follows:

> * * * A thing may be within the letter of a statute and not within its meaning, or within its meaning though not within its letter * * *. In cases admitting of doubt the intention of the lawmaker is to be sought in the *entire context of the section* * * *. [P. 301; emphasis added.]

The entire context of section 516(b) does not support the argument of *amicus*. The notice to be given to the Secretary of the Treasury by a dissatisfied American manufacturer, producer, or wholesaler, is "notice that he desires to protest the classification of, *or* rate of duty assessed upon, the merchandise." [Emphasis added.] The section then proceeds to require the Secretary to furnish the complainant (i.e., the American manufacturer) with such information as to entries "as will enable the complainant to protest the classification of, *or* the rate of duty imposed upon, such merchandise * * *." [Emphasis added.]

After this clear exposition of the right to protest *either* classification *or* duty rate, section 516(b) goes on to permit the complainant, within a prescribed period, to file "a protest in writing setting forth a description of the merchandise and the classification and rate of duty he believes proper."

The construction for which *amicus* argues is that, notwithstanding the clearly stated right to be dissatisfied with, and to give notice of intention to protest, and to receive from the Secretary information necessary to protest, *either classification or rate*, nevertheless this right is limited by a requirement that the protest itself shall state the classification *and* the rate of duty which complainant believes to be proper. I do not so easily attribute to Congress an intention to deny, by procedural specification of protest content, the substantive right that is clearly and explicitly given and repeated in the same section of the statute, namely, to protest *either* classification *or* rate.

Nor is there inconsistency in this construction. Granted dissatisfaction with classification or with duty rate, or perhaps with both, and notice of intention duly given to protest that with which the complainant is dissatisfied, the procedure as to the ensuing protest requires statement of the claims which the protestant makes. A different classification, if that is claimed; a different duty rate, if that is claimed; or, perhaps, both a different classification and a different duty rate.

This construction permits the court to review judicially all those classifications that are protested as being improper. There is no reason to infer, from a reading of section 516(b) as a whole, that Congress intended that an improper classification, such as we have held this to be, must stand when the correct classification is one which Congress has made duty free.

A construction of a statute which preserves its usefulness is to be preferred to a construction which does not. *United States* v. *Peter Kiewit Sons Co. of Canada, Ltd.,* 195 F. Supp. 752.

*Amicus* has interjected another argument against our jurisdiction that was not advanced by defendant. In brief, *amicus* argues that each of the procedures antecedent to protest must be shown by sufficient proofs introduced by plaintiff, and that it is not enough that defendant has stipulated full procedural compliance.

It is the established practice of this court to confine proofs of procedural compliance to issues raised by the parties. For example, trials are not encumbered with proofs showing the timely filing of protests, unless defendant pleads lack of timely filing. A plaintiff need not show, by proofs, that a protest was filed by one duly authorized to do so, unless defendant objects that there was not such authority. I could multiply similar examples, but deem it not necessary to do so.

Moreover, it is not merely in matters of procedure that defendant's concession frees plaintiff from the burden of proof. As to substantive issues, concession by defense counsel suffices to prove plaintiff's claim, to the extent of the concession. *International Vitamin Corp.* v. *United States,* 19 Cust. Ct. 76, C.D. 1071; *The Werner G. Smith Company* v. *United States,* 23 Cust. Ct. 34, C.D. 1186.

Both as to stipulations and concessions made by counsel, I adopt as my own the statement of Lenroot, J., in *North American Mercantile Co.* v. *United States,* 18 CCPA 74, T.D. 44030, at page 78:

* * * we think it not improper to say that the members of the customs bar, including the Government attorneys, are as a rule attorneys of the highest integrity and established ability. It is to the interest of the public that customs litigation should be expedited in all proper ways, and the courts should adopt a liberal attitude with respect to stipulations, with the presumption that they are made in good faith and with a view of protecting the interests of both sides of the controversy.

Here the matters of which *amicus* complains are, in my view, matters of procedure and not substantive. Defendant not only has raised no issue as to compliance with procedures antecedent to the filing of the protest, but by express language defendant has conceded in open court that there was such compliance. Whether procedure or substance, such concession suffices, so that litigation may be expedited.

*Amicus* may not be heard to raise an issue that has been laid to rest by defendant, nor to assert a requirement for proofs which defendant's concession has waived.

In some part, *amicus* argues from an inaccurate or incomplete reading of the record. *Amicus* asserts that the Secretary's notice, under section 516(b), was published the same day as the day of the collector's liquidation. I have some doubt, even if this were true, whether it could be asserted by defendant to defeat plaintiff's right to protest. It was the collector who gave to plaintiff, pursuant to the direction of the Secretary of the Treasury, the information he was required to supply as the basis of this protest, and in the face of plaintiff's declared intention to protest. A protestant should be able to rely on the accuracy of information that is peculiarly within the knowledge of the Government. Whether or not defendant could be heard to assert its own error, if there were error, to defeat plaintiff's protest filed in reliance on such information, I am not required to decide. The fact is both that there was no error, and defendant does not claim that there was error. *Amicus* cannot be heard to raise the issue.

However, the record is against this argument by *amicus*. Overlooked was a stipulation by counsel for the parties that the required publication was on August 28, 1963, which is the day before the protested liquidation. That argument falls on the facts.

*Amicus* is not permitted to introduce facts or to frame the issues. This is an established judicial rule of *amicus* conduct. It is a rule of our court. *United States* v. *F. M. Jabara & Bros.*, 19 CCPA 76, T.D. 44899, cited by plaintiff.

The fact as to publication is stipulated. The issue as to plaintiff's procedural compliance was framed by the statement of defense counsel in court, as follows:

* * * The protest was filed on August 30, 1963, just prior to the effective date of the Tariff Schedules of the United States, and defendant acknowledges that the procedural prerequisites and requirements specified in Section 516(b) were fully complied with prior to the filing of the protest. [R. 10.]

There remains for consideration a further point that is argued by *amicus* in his brief, but which is not argued by defendant. I discuss it without conceding that *amicus* has the right to enlarge the issues as framed by the parties.

In substance, *amicus* contends that when Congress enacted section 202 of the Tariff Classification Act of 1962 (Public Law 87–456), it did not intend that an American manufacturer or producer of merchandise, who at times also might be the importer of such merchandise, could file a protest, *qua* American manufacturer or producer, under section 516(b), and thus, if that protest prevailed, bring about the resulting tariff rate reduction for which section 202 specifically provides. The basis of this argument appears to be that, if he were to file a section 514 protest with respect to merchandise of his own importation, Congress had provided no similar modification of the new

classification schedules consequent on a judicial decision favorable to a section 514 claim; hence, the argument of *amicus* proceeds; Congress could not have intended to give that effect to a judicial decision favorable to such an American manufacturer or producer on his section 516(b) protest against the rate of duty assessed on another's importation. The gist of this contention is that the benefits conferred by section 202 are limited to those American manufacturers or producers who never import such merchandise as that which they manufacture or produce.

In support of this argument, *amicus* cites *George S. Fletcher* v. *United States*, 25 CCPA 195, T.D. 49294. The decision in the *Fletcher* case is not on all fours.

The protest there was filed, not under section 516(b) but under section 514, by the importer of certain pineapples. The pineapples had been assessed with duty at the reduced rate provided in a trade agreement between the United States and Cuba, entered into on August 24, 1934. (T.D. 47232; 66 Treas. Dec. 189.) The section 514 protest claimed a higher (unreduced) rate of duty, on the ground that the Reciprocal Trade Agreement Act was unconstitutional and, therefore, the trade agreement with Cuba was invalid and the rate reduction ineffective.

Defendant moved, in the trial court, for dismissal of the protest on the ground that the court had no jurisdiction of a section 514 protest which claimed a higher duty rate than the rate which the collector had assessed. The trial court sustained the motion to dismiss. Plaintiff sought a rehearing. That was denied. Plaintiff appealed.

Our appeals court observed that the appeal from the judgment dismissing the protest raised no issue, for its consideration, as to the constitutionality of the Reciprocal Trade Agreement Act; that the sole issue before the court was as to jurisdiction *under section 514* to entertain this protest.

Much of the opinion of the appeals court has to do with section 514 which, since enactment of the 1913 act, has not permitted the protest which *Fletcher* had filed, namely, a protest seeking a higher duty rate.

The circumstances which gave rise to the court's discussion of section 516(b) protests, and the views of the court as to such protests, are stated in the opinion, as follows:

* * * In the petition for rehearing the appellant set out that he was prepared to testify, if the rehearing were granted, that the action of the collector in applying the provisions of the said trade agreement resulted in damage to the American industry of raising and selling pineapples and resulted in damages to him personally since he was such a producer.

At the outset it should be mentioned that the so-called Reciprocal Trade Agreement Act, *supra*, definitely provides that—

The provisions of sections 336 and 516(b) of the Tariff Act of 1930 shall not apply to any article with respect to the importation of which into the

United States a foreign trade agreement has been concluded pursuant to this Act, or to any provision of any such agreement.

Thus the record shows that the appellant, an American producer, having been denied the right to protest under said section 516(b) of the Tariff Act of 1930, seeks to raise the same question by protesting as an importer the action of the collector in assessing a lower rate than would have been applicable had the trade agreement not been entered into.

\* \* \* \* \* \* \*

It is the position of the Government, and of counsel for the Republic of Cuba and the Cuban Chamber of Commerce in the United States, Inc. (the latter as *amicus curiae*), and substantially that of the trial court, \* \* \* second, that the context of the provisions hereinbefore quoted would indicate that Congress, in the enactment of the tariff acts of 1913, 1922 and 1930, never intended to give an American producer the right to protest a lower rate except in the last two acts where it is specially provided for under the said American producer's provision (section 516). It is further argued in substance that the fact that Congress has made inapplicable a right which formerly existed in the producer to protest a lower rate of duty by amending the Tariff Act of 1930 conclusively shows that it was not the legislative intent to permit a producer to protest any action of the collector under the provisions of the Reciprocal Trade Agreement Act.

\* \* \* \* \* \* \*

In the Tariff Act of 1922, as a means of protecting American manufacturers, producers, or wholesalers, Congress provided that they should have the right to protest the assessment by the collector of a rate of duty which was believed to be erroneous. This, of course, included a rate which was regarded as being too low. Definite provisions in section 516 were made to that effect. In the Tariff Act of 1930 substantially the same provision as far as is material here was reenacted. In 1934 Congress expressly withdrew the right of the so-called American producer to protest in event of a rate having been fixed by virtue of the so-called Reciprocal Trade Agreement Act. Obviously by its express amendment of the 1930 act it did not intend that the producer could do indirectly what it denied him the right to do directly. If a producer, such as the appellant, could make an importation and accomplish the same purpose by protesting the rate fixed under the amended Tariff Act of 1930, the amendment to the act would amount to a nullity. [*George S. Fletcher* v. *United States, supra*, pp. 196, 197, 198, 200.]

What *Fletcher* holds, then, is that an importer, protesting the liquidation of his own importation may not, since the 1913 act, claim in a section 514 protest a higher duty rate because of his dissatisfaction with the lower assessed rate. *Fletcher* had no standing, therefore, to raise the constitutional issue on his section 514 protest. When he asserted that he is also a producer of pineapples and, as such, had a section 516(b) right to protest any rate with which he is dissatisfied, when assessed on another's importation, the court pointed out that, even if the protest had been filed under section 516(b) against the rate of duty assessed on another's importation, protest likewise would be dismissed because his section 516(b) right, as an American producer, to protest the rate on pineapples had been nullified. *Fletcher* could not, so the court held, be heard

to assert a nonexistent section 516(b) right as the basis for an asserted right that was nonexistent under section 514. This seems to me sound reasoning.

However, section 202 of the Tariff Classification Act of 1962 did not nullify, as did the Reciprocal Trade Agreement Act of 1934, the right of an American manufacturer or producer or wholesaler to protest under section 516(b) a rate with which he is dissatisfied. To the contrary, section 202 carefully preserves the section 516(b) right, expressly continues the jurisdiction of the courts in protests under section 516(b), and by particular language specifies that the intention of Congress was to make effective duty rate changes consequent on judicial decision sustaining a section 516(b) protest, timely filed as this protest was.

*Amicus* is not in good standing when he ascribes to plaintiff improper motives and interests in bringing this suit. The record shows no facts in support of such an inference; and, as earlier stated, *amicus* must accept the case before the court with the issues as they are made by the parties. *United States* v. *F. M. Jabara & Bros., supra.*

Moreover, as *amicus* must know, the purpose of a plaintiff in bringing suit is of no moment. The issue is whether plaintiff has a valid cause of action. If plaintiff has a valid cause of action, his motive in suing is immaterial.

I take judicial notice, as a judge may, that plaintiff is only one of several who have brought actions in this court, raising variously as importers or as American manufacturers, producers, or wholesalers, the substantive issue of classification that is before us here, namely, whether collectors have acted lawfully in denying protest claims that synthetic diamond particles, in mesh sizes such as those here in litigation, should be classified as diamond dust. I would hold, on the record and the law, that plaintiff has standing here to contest the legality of that classification.

This makes it necessary for me to give consideration to the issue of classification. We have already held that classification of synthetic dust as diamond dust is proper. *Christensen Diamond Products Co.* v. *United States, supra.* In the *Christensen case*, we held that synthetic diamond particles in mesh size 80/100 are the article enumerated as diamond dust in paragraph 1668, and should be classified as such.

There is, in the synthetic diamond particles of the entry before us, a range of mesh sizes, viz., 60/80, 80/100, and 100/120, whereas in the incorporated case the particles were all of the 80/100-mesh size. I find that this slight difference in size does not change decision and that these particles are within the diamond dust enumeration. If size 80/100 is dust, then *a fortiori* size 100/120 is also dust. As to size

60/80, the evidence in the incorporated case brings particles of that mesh size also within the enumeration as diamond dust.

Defendant introduced no evidence to negative the *prima facie* case plaintiff has made that its business operations include the manufacture or production of diamond particles, of the mesh sizes of the protested liquidation, and that it also maintains and operates a wholesale division.

The protest claim to classification of this merchandise as diamond dust, under paragraph 1668, should be sustained. In view of the unanimous decision of this division on that classification issue, the alternative protest claim for classification as artificial abrasives, under paragraph 1514, should be dismissed.